**CORPORATIONS**

**EXECUTIVE COMPENSATION – WHETHER EXECUTIVE COMPENSATION MAY CONSTITUTE A "WASTE" OF CORPORATE ASSETS AND HOW SUCH COMPENSATION MAY BE REGULATED**


March 8, 2010


*The Honorable Jamie Raskin*
*The Honorable James Brochin*
*Maryland Senate*


You have asked about the law governing executive compensation at Maryland corporations. In particular, you have asked whether payment of excessive executive compensation can constitute a waste of corporate assets. You have also asked whether, in such circumstances, any State official would have standing to initiate a *quo warranto* action under Annotated Code of Maryland, Corporations & Associations Article ("CA"), §1-403(d) to challenge the payment of such compensation. Finally, you have asked whether the General Assembly could lawfully restrict executive compensation through legislation. Your questions were prompted by concerns about certain executive compensation practices at Constellation Energy Group ("CEG" or "the Company") and, more specifically, the compensation paid or owing to the chief executive officer of CEG.

Our conclusions as to the law are as follows:

★    Excessive executive compensation may constitute a "waste" of corporate assets.

★    The courts usually defer to decisions of a board of directors on an issue such as executive compensation under the "business judgment rule," also referred to by the Court of Appeals as the "principle of non-intervention." This principle depends in part on whether the directors acted in good faith.

★　Allegations of corporate waste are typically litigated in the context of a shareholder derivative action, rather than a *quo warranto* action.

★　CA §1-403(d) was part of the Model Business Corporation Act, as adopted in Maryland some years ago. Under that statute, the Attorney General retains authority to seek injunctive relief or dissolution of a corporation that engages in unauthorized or "ultra vires" actions. There are few cases in the last century in which state Attorneys General have exercised this authority and none challenging corporate decisions as to executive compensation.

★　The General Assembly has authority to enact legislation regulating executive compensation at Maryland corporations and businesses. There will be issues of retroactivity and vested rights to the extent such legislation attempted to alter compensation due under existing agreements.

# I

## Background

Executive compensation at American corporations has generated controversy during the past two decades. Some critics have pointed to the fact that the pay of American CEOs has grown rapidly in recent years and exceeds the compensation of similarly situated executives in other countries. For example, during the period 1990 through 2003, CEO compensation increased by 313% while the average worker's pay increased by 49% and inflation was 41% for the same period. *See* Interfaith Center on Corporate Responsibility at <www.iccr.org/news/press-releases/2004/ pr_ceopay041504.htm>. A 2005 study of executive pay in 26 countries found that American executives made twice as much as comparable executives in Western European countries. *Id*. More recently, another study found that, compared to other western industrialized countries, the United States had the greatest disparity between CEO compensation and the compensation of average workers. Heather Landy, *Behind the Big Pay Days – Growing Sense of Outrage Over Executive Pay*, Washington Post (November 15, 2008) at p. A08.

The full extent of executive compensation can be elusive as it may take numerous forms, including base salary, benefits, incentive awards, perquisites, and other elements, each with its own formula. Moreover, a significant portion of many CEOs' compensation consists of pension benefits, though they are not as readily understood as direct compensation. Failure to consider the design and value of such a plan can lead to an underestimate of the CEO's actual compensation and an overestimate of the extent to which that compensation is actually linked to performance of the company. *See* L. Bebchuk & R. Jackson, *Putting Executive Pensions on the Radar Screen*, Harvard John M. Olin Discussion Paper No. 507 (March 2005).

In response to such criticism, boards of directors and compensation committees have increasingly sought to validate their decisions concerning executive pay through reliance on outside experts and data. Thus, they have made greater use of compensation consultants and labor market studies involving "peer" companies. Some argue that the reliance on compensation consultants and compensation studies may actually have contributed to the increase in CEO pay in recent years. *See* Simmons, *Taking the Blue Pill: The Imponderable Impact of Executive Compensation Reform*, 62 SMU L. Rev. 299, 352-53 (2009) (describing the "Lake Wobegon effect" in which compensation committees tend to set pay at the 75th percentile of comparable organizations with the result that all executives are considered "above average").

To allow for an informed critique of such decisions of compensation committees, and the opinions and data on which they rely, the Securities and Exchange Commission ("SEC") has required more detailed disclosure by public companies concerning the elements of executive compensation, the board or committee's philosophy underlying its decision, and the references used to justify those decisions. To some extent, enhanced disclosure has exposed flaws in the system by which some companies set compensation. For example, since the SEC required identification of peer groups in 2006, several studies have concluded that the selection of peer groups for benchmarking executive pay is subject to manipulation. *See, e.g.,* M. Faulkender & J. Yang, *Inside the Black Box: The Role and Composition of Compensation Peer Groups* (working paper -Washington University and Indiana University 2008) (firms forgo lower paid industry peers in favor of higher paid peers from outside industry); A. Albuquerque, G. DeFranco, & R. Verdi, *Peer Choice in CEO Compensation* (Boston University 2009) (finding that firms appear to be self-serving when selecting peers for executive

compensation decisions). However, enhanced disclosure alone may not be the entire cure. *See* Cioppa, *Executive Compensation: The Fallacy of Disclosure*, 6:3 Global Jurist Topics (Berkeley 2006) (arguing that even the enhanced disclosure has not disciplined compensation decisions). To decipher disclosures made concerning the disparate elements of executive compensation, one must be "part attorney, part accountant, and part archeologist." S. Thurm, *For CEO Pay, a Single Number Never Tells the Whole Story*, Wall Street Journal, p. A2 (March 6-7, 2010) (quoting compensation consultant Brian Foley).

In the face of such evidence, one of the foremost judicial proponents of economic analysis of legal problems has concluded that the fiduciary duties of corporate directors, even coupled with enhanced disclosure, should not insulate compensation decisions from judicial review for reasonableness. *Jones v. Harris Associates, L.P.*, 537 F.3d 728, 730 (7th Cir. 2008), *cert. granted*, 129 S.Ct. 1579 (2009) (Posner, J., dissenting). "...[E]conomic analysis [of compensation decisions] ... is ripe for reexamination on the basis of growing indications that executive compensation in large publicly traded firms is excessive because of feeble incentives of boards of directors to police compensation. Directors are often CEOs of other companies and naturally think that CEOs should be well paid. And often they are picked by the CEO. Compensation consulting firms, which provide cover for generous compensation packages voted by boards of directors, have a conflict of interest because they are paid not only for their compensation advice but for other services to the firm – services for which they are hired by the officers whose compensation they advised on." *Id*. (citations omitted).

## II

### Challenging Executive Compensation Decisions under Current Law

#### A. *Whether Excessive Executive Compensation May Constitute a Waste of Corporate Assets*

A Depression-era Supreme Court case supports the proposition that excessive compensation of corporate executives may constitute a waste of corporate assets and be challenged in an action brought by a shareholder. In *Rogers v. Hill*, 289 U.S. 582 (1933), a shareholder of the American Tobacco Company challenged a corporate bylaw approved by the shareholders, setting the compensation of the top executives of the company, as providing

unreasonably large compensation.[1] The bylaw provided that the six top executives would receive, in the aggregate, 10% of the amount by which the company's earnings exceeded a baseline figure – obviously, a performance incentive. For example, in 1930, the president of the corporation received $168,000 in salary, $273,000+ in "cash credits", and $842,000+ in bonus under the bylaw.

After dealing with procedural issues, the Court first held that the shareholders had authority to adopt such a bylaw under New Jersey corporation law and the corporation's charter. The Court then turned to the plaintiff's contention that the compensation was "not equitable or fair." It analyzed the issue as follows:

> As the amounts payable depend upon the gains of the business, the specified percentages are not per se unreasonable....Regard is to be had to the enormous increase of the company's profits in recent years....
>
> While the amounts produced by the application of the prescribed percentages give rise to no inference of actual or constructive fraud, the payments under the bylaw have by reason of the increase in profits become so large as to warrant investigation in equity in the interest of the company. Much weight is to be given to the action of the stockholders, and the bylaw is supported by the presumption of regularity and continuity. But the rule prescribed by it cannot, *against the protest of a shareholder*, be used to justify payments of sums as salaries so large as in substance and effect to amount to spoliation or waste of corporate property.

---

[1] In a companion case, the shareholder also challenged a stock subscription plan embodied in another bylaw that allocated large quantities of stock to the company president and directors for a subscription price less than one-fourth of the market price – with an estimated value at that time for the president of $1,169,000. This case also reached the Supreme Court, which dismissed it, over the dissents of Justices Stone, Brandeis, and Cardozo, on jurisdictional grounds. *Rogers v. Guaranty Trust Co.*, 288 U.S. 123 (1933).

289 U.S. at 591 (emphasis added). The Court endorsed a standard suggested in a dissenting opinion in the Second Circuit when the case was before that court:

> If a bonus payment has no relation to the value of services for which it is given, it is in reality a gift in part, and the majority stockholders have no power to give away corporate property against the protest of the minority.

*Id.* at 591-92. The Court remanded to the district court to determine whether the bonuses constituted a waste and misuse of corporate assets. The case ultimately resulted in a settlement under which no past compensation was paid, the amount of corporate income that would trigger executive bonuses was doubled, and the bonus percentage was reduced by 50%. *See* 1 Cox & Hazen on Corporations §11.05 at p. 569 & n.39.

As you noted in your letter, the Delaware Chancery Court – a frequent forum for litigation concerning corporate governance – has recently recognized the possibility that a compensation package to be paid to the departing CEO of a major corporation could constitute waste of corporate assets. *In re Citigroup, Inc. Shareholder Derivative Litigation*, 964 A.2d 106 (Del. Chan.Ct 2009). That case was a shareholder derivative action against Citigroup, in which the court rejected a number of claims, including claims of corporate waste related to the company's purchase of subprime loans, its buy-back of $645 million of the company's shares, and its investment in assets that were unable to pay off maturing debt. The court held that the plaintiffs failed to raise a reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment.

However, the Chancery Court allowed a claim of waste related to executive compensation to go forward. It articulated the following standard:

> The directors of a Delaware corporation have the authority and broad discretion to make executive compensation decisions. The standard under which the Court evaluates a waste claim is whether there was "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person

might be willing to trade." It is also well settled in our law, however, that the discretion of directors in setting executive compensation is not unlimited. Indeed, the Delaware Supreme Court was clear when it stated that "there is an outer limit" to the board's discretion to set executive compensation, "at which point a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste."

964 A.2d at 138 (footnotes omitted). The compensation package was set forth in a letter agreement under which the former CEO was to receive $68 million upon his departure from Citigroup, including bonus, salary, and accumulated stockholdings. In addition, he was to receive an office, administrative assistant, and car and driver for 5 years (or until he commenced full time employment with another employer). In return for the compensation package and perquisites, the former CEO would sign a non-compete agreement, a non-disparagement agreement, a non-solicitation agreement, and a release of claims against the company.

The Delaware court said that it needed more information to determine whether this compensation package constituted "waste" – in particular (1) how much additional compensation the CEO received as a result of the letter agreement and (2) the real value of the promises made by the CEO. Without that information it could not decide whether the compensation package was "beyond the outer limit." 964 A.2d at 138.

Corporation law treatises acknowledge that excessive executive compensation may constitute a waste of a corporation's assets, but generally articulate a stringent test that appears difficult to satisfy. *See* 1 Knepper & Bailey, *Liability of Corporate Officers and Directors* §3-14 (unless the directors approving the compensation have a personal interest, a plaintiff alleging corporate waste in executive compensation must demonstrate that no reasonable business person would find that the corporation had received adequate consideration); 1 *Cox & Hazen on Corporations* §11.05 (approval of executive compensation by disinterested outside directors may present an "unsurpassable barrier" to an action alleging waste of corporate assets). The stringent test is a result of the deference generally accorded decisions of corporate directors under what is called the "business judgment rule."

### B.    *Business Judgment Rule*

Assuming that the facts suggest excessive executive compensation, the primary hurdle in any case alleging that such compensation constitutes a waste of corporate assets is the "business judgment rule."  Under this doctrine, courts generally defer to the judgment of a disinterested board of directors.  The business judgment rule is also reflected in the Maryland statute setting forth the standard of care to be exercised by a corporation's directors.  CA §2-405.1.

The Court of Appeals most recently referred to the business judgment rule under Maryland law in *Tackney v. United States Naval Academy Alumni Ass'n, Inc.*, 408 Md. 700, 971 A.2d 309 (2009).  That case concerned the propriety of applying the "principle of non-intervention" in a case involving a dispute among members of a voluntary membership organization.  The Court traced this principle to several different sources, depending on whether the organization is incorporated and the place of incorporation.  With respect to Maryland corporations, the principle derives from the business judgment rule under Maryland law:

> If the voluntary membership organization is incorporated in Maryland, the business judgment rule applies to decisions regarding the corporation's management.  The business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith.  The rationale for the business judgment rule is that:

> Although directors of a corporation have a fiduciary relationship to the shareholders, they are not expected to be incapable of error.  All that is required is that persons in such positions act reasonably and in good faith in carrying out their duties... Courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence.

408 Md. at 712-13 (*quoting NAACP v. Golding*, 342 Md. 663, 679 A.2d 554 (1996)).  The Court applied the business judgment rule in the case before it and affirmed the circuit court's decision declining

to referee a dispute over the tenure and selection of the organization's board of trustees.

A Fourth Circuit decision concerning a Maryland corporation illustrates the application of the business judgment rule in a challenge to executive compensation. In *McQuillen v. National Cash Register Co*., 112 F.2d 877 (4th Cir. 1940), shareholders of a Maryland corporation challenged various actions of the corporation, including a generous grant of stock options to a former chief executive of the company. The Court looked to Maryland law and affirmed the following standard for assessing such claims:

> It is obviously not the province of a court of equity to act as the general manager of a corporation or to assume regulation of its internal affairs. If the chosen directors, without interests in conflict with the interests of stockholders, act in good faith in fixing salaries or incurring other expenses, their judgment will not ordinarily be reviewed by the courts, however unwise or mistaken it may appear ...

112 F.2d at 884 (quoting standard set forth in the district court decision).[2] The court emphasized that a very generous compensation package would not necessarily be wasteful:

> In situations of this kind, courts must distinguish between compensation which is merely excessive and is thus lawful, and compensation which is actually wasteful and is thus unlawful. Courts cannot here condone

---

[2] The Court qualified this statement by noting that a court might take action if the directors were personally interested in a particular decision:

> but this is far from saying that equity will refuse to redress the wrong done to a stockholder by action or policy of directors, whether in voting themselves excessive salaries or otherwise, which operates to their personal advantage, without any corresponding benefit to the corporation.

112 F.2d at 884.

on the part of those in control of a corporation either actual bad faith or a total neglect or even utter indifference to the rights of stockholders. Necessarily, much must be entrusted to the discretion of corporate directors and courts should intervene here if, and only if, there has been so clear an abuse of this discretion as to amount legally to waste.

*Id.* In the case before it, the Court found that the compensation package for the chief executive had been authorized by appropriate corporate action in the proper form and that the directors had acted in good faith. It also found that nothing in the contract was contrary to the corporate charter or the corporation law of Maryland and that the options grant was therefore not illegal or ultra vires. *Id; see also Mona v. Mona Electric Group, Inc*., 176 Md. App. 672, 700-5, 934 A.2d 450 (2007) (applying business judgment rule in context of shareholder derivative action based in part on allegations of excessive executive compensation).

As indicated above, the business judgment rule has been recognized in statute in Maryland:

(a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

(b) (1) In performing his duties, a director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by:

(i) An officer or employee of the corporation whom the director reasonably

believes to be reliable and competent in the matters presented;

(ii) A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or

(iii) A committee of the board on which the director does not serve, as to a matter within its designated authority, if the director reasonably believes the committee to merit confidence.

(2) A director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted.

(c) A person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under §5-417 of the Courts and Judicial Proceedings Article.

\*     \*     \*

(e) An act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section.

\*     \*     \*

(g) Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation.

CA §2-405.1(a) - (c), (e), (g).[3]

---

[3] A version of the business judgment rule was first codified in 1976. Chapter 567, §4, Laws of Maryland 1976.

The business judgment rule thus establishes a formidable hurdle to any effort to challenge a decision of a board of directors concerning compensation of corporate officers. If the board members or committee members make those decisions in good faith in a reasonable belief that they are acting in the best interests of the corporation and with reliance on consultants and other professionals they believe to be reliable, those decisions likely will be immune from challenge. Thus, one who challenges a decision concerning executive compensation at a private corporation as a waste of corporate assets must be able to demonstrate that the directors' decision was self-interested – in bad faith – or the result of neglect or incompetence.

### C.    *Shareholder Derivative Actions*

As the cases outlined above suggest, a claim that excessive executive compensation constitutes a waste of corporate assets would typically be asserted in an action by one or more shareholders on behalf of the corporation – commonly called a shareholder derivative action. In *Werbowsky v. Collomb*, 362 Md. 581, 766 A.2d 123 (2001), the Court of Appeals discussed in detail shareholder derivative actions under Maryland law. The case before the court involved, among other things, an allegation of corporate waste and breach of fiduciary duties by the directors in connection with a transaction between the corporation and an affiliated corporation. In an opinion discussing the circumstances under which a plaintiff shareholder is excused from making a pre-suit demand on the corporation to remedy the matter, Judge Wilner discussed the largely common law basis for shareholder derivative suits in Maryland. Executive compensation was not an issue in the case.

### D.    *Quo Warranto Actions*

You specifically inquired about the possibility that a State official could challenge executive compensation under CA §1-403(d), which is sometimes referred to as a "*quo warranto*" action.[4] That provision authorizes the Attorney General to seek to enjoin a corporation from engaging in "unauthorized business" on the ground that it legally lacks the power or capacity to do so. *See also* CA §3-513 (State Department of Assessments and Taxation may authorize Attorney General to seek, in public interest, forfeiture of corporate

---

[4] The Latin translates as "by what authority." *See Black's Law Dictionary* (9th ed. 2009) at p. 1271.

charter for abuse, misuse, or failure to use corporate powers). While *quo warranto* has a common law pedigree and has been part of Maryland's corporation statute for six decades, we did not find any case in which it was used to challenge executive pay decisions of a private corporation.

*Common Law Writ of Quo Warranto*

This provision is derived from the common law writ of *quo warranto*. The history of that writ was discussed at some length in a recent Supreme Court decision that did not concern executive compensation or corporate governance. In *Cuomo v. The Clearinghouse Ass'n, LLC*, 129 S.Ct. 2710 (2009), Justice Scalia distinguished "visitorial" powers of state banking regulators that have been preempted by federal law from the "law enforcement" powers of the state Attorneys General that are not preempted. In the course of the opinion, he traced the "visitorial" powers of state regulators to the 19th century notion that a state was the "visitor" of all companies incorporated within that state. The writ of *quo warranto* was one means by which the state exercised those powers. Justice Scalia explained:

> Historically, the sovereign's right of visitation over corporations paralleled the right of the church to supervise its institutions and the right of the founder of a charitable institution "to see that [his] property [was] rightly employed." ... By extension of this principle, "(t)he king [was] by law the visitor of all civil corporations. A visitor could inspect and control the visited institution at will."
>
> ...A State was the "visitor" of all companies incorporated in the State, simply by virtue of the State's role as sovereign: The "legislature is the visitor of all corporations founded by it."
>
> This relationship between sovereign and corporation was understood to allow the States to use prerogative writs – such as mandamus and *quo warranto* – to exercise control "whenever a corporation [wa]s abusing the power given it, or, ...or acting adversely to the

> public, or creating a nuisance."... State visitorial commissions were authorized to "exercise a general supervision" over companies in the State."

129 S.Ct. at 2715-16 (Citations omitted).[5] He also described the use of writ of *quo warranto* by the federal government to determine whether a national bank "is acting in excess of its charter powers." *Id.* at 2717.

The Court of Appeals of Maryland discussed *quo warranto* powers under Maryland law in *Insurance Commissioner v. Blue Shield of Maryland*, 295 Md. 496, 456 A.2d 914 (1983). In the course of describing the visitorial powers of the Insurance Commissioner over insurance companies under Maryland state law, the Court reviewed the common law concerning the State's right of "visitation" over corporations and stated that "'visitation' has no fixed meaning, at least in this state." 295 Md. at 519. The Court derived the scope of visitation over corporations from three corporation law texts that were in general agreement that "the old power of visitation survives only in the modern and more limited right of the State and its courts to interfere in cases of abuse or misuse of the charter." *Id.* at 522. In the case before it, the Court held that the Insurance Commissioner lacked authority to order changes in participation agreements that the Commissioner had previously approved.

Older Maryland cases recognized *quo warranto* as a valid cause of action against a corporation when the corporation had violated its own charter or State law. For example, in *State v. Easton Social Literary & Musical Club*, 73 Md. 97, 20 A. 783 (1890), the Court held that the State could seek the forfeiture of the corporate charter of an incorporated social club that was selling alcoholic beverages to its members in violation of State law. "A corporation may no more violate a law with impunity than an individual can; and if the unlawful acts be of a nature to be detrimental to the public, and be done by and for the corporation by

---

[5] The dissenting opinion (Thomas, J.) contains a similar, though longer, description of common law visitorial powers of states over civil corporations and argues that those powers were broad enough to encompass law enforcement powers. (In the context of the case before the Court, this would mean that the state Attorney General's law enforcement powers were also preempted by the federal statute).

its authorized agents, there is such abuse and misuse of its powers and franchises as will justify the state in recalling such corporate powers and franchises, and annulling and vacating the charter." 20 A. at 785. In remanding the case to the lower court, the Court noted that the lower court could withhold a decree of forfeiture to give the corporation an opportunity to correct the violations. *Id.*

*Maryland Quo Warranto Statute*

The Maryland statute, CA §1-403(d), is based upon §7 of the 1951 version of the Model Business Corporation Act.[6] When the

---

[6] The statute reads:

(a) Unless a lack of power or capacity is asserted in a proceeding described in this section, an act of a corporation ... is not invalid or unenforceable solely because the corporation lacked the power or capacity to take the action.

(b) (1) Lack of corporate power or capacity may be asserted by a stockholder in a proceeding to enjoin the corporation from doing an act ...

(2) If the act ... sought to be enjoined is based on a contract to which the corporation is a party and if all parties to the contract are parties to the proceeding, the court may set the contract aside and enjoin its performance.

(3) The court may award compensatory damages to any party who suffers a loss because of the action of the court. However, the court may not award compensatory damages for loss of anticipated profits to be derived from performance of the contract.

(c) Lack of corporate power or capacity may be asserted by the corporation in a suit brought in its name by the corporation or its receiver ..., or in a representative suit brought by a stockholder against its present or former officers or directors.

*(d) Lack of corporate power or capacity may be asserted by the Attorney General in a proceeding for the forfeiture of the charter of the*

(continued...)

Model Business Corporation Act was first developed in 1951, it eliminated much of the common law doctrine concerning *ultra vires* actions of corporations. Prior to the Model Act, the outcome of cases deciding the contractual obligations of corporations frequently turned on the question of whether the corporation had the power or capacity to enter into the contract in the first place. *See* Note, *Ultra Vires Contracts of Corporations in Maryland*, 1 Md. L. Rev. 145 (1936) (reviewing Maryland cases on enforceability of corporate contracts in light of *ultra vires* doctrine)[7]; *see also* Note, *Corporations - Ultra Vires – Distinction between Powers and Objects in Articles of Incorporation*, 46 Harv.L.Rev. 1337 (1933); Note, *Statutory Modification of the Doctrine of Ultra Vires*, 44 Harv.L.Rev. 280 (1930). Some asserted that the inconsistencies in the case law could be traced to confusion as to the theory underlying the doctrine. *See* Carpenter, *Should the Doctrine of Ultra Vires be Discarded?*, 33 Yale L.J. 49 (1923). While the Model Act eliminated many of those issues by circumscribing use of the doctrine, it explicitly retained the ability of a state Attorney General to pursue *quo warranto* actions against corporations for misuse of their powers.

The commentary to the Model Act states:

> The doctrine of inherent incapacity is eliminated and it is unnecessary for persons dealing with a corporation to inquire closely into the limitations on the purposes and powers of the corporation. The early theory was that corporations could not act outside the narrow purposes and powers customarily stated in their articles together with the powers necessarily incidental thereto, and that anyone who dealt with a corporation acted at his peril

---

[6] (...continued)
*corporation or to enjoin it from transacting unauthorized business.*

CA §1-403 (emphasis added).

[7] Notably, this article observes that one of the arguments in favor of not enforcing contracts on the basis of the *ultra vires* doctrine – the public interest in ensuring that corporations chartered for a specific purpose do not transcend that purpose – is particularly strong with respect to public service corporations. 1 Md. L. Rev. at 154 & n.47A.

in that regard. The result of that theory was a large volume of litigation in which the courts were forced to consider at great length the scope of purposes, and express and incidental powers of corporations....

Section 7 [*i.e.*, CA §1-403] protects the shareholders of a corporation against unauthorized acts by providing that they may enjoin unauthorized acts and the officers and directors may be held liable for damages resulting therefrom....The interests of the state are protected by providing that the attorney general may bring proceedings to enjoin the transaction of unauthorized business or to dissolve the corporation if it has done unauthorized acts.

..........

Section 7, being limited to the defense of lack of capacity or power, does not affect the defense of illegality. *Ultra vires* and illegality have been confused in some cases.

...........

Model Business Corporation Act Annotated §7 at pp. 278-79 (1971). Thus, the purpose of §7 (*i.e.*, CA §1-403) was to eliminate corporate disputes based on the *ultra vires* doctrine. *See also* 1 Cox & Hazen on Corporations, §4.07 (noting that modern corporation law relies on business judgment rule to determine permissible corporate activities rather than *ultra vires* doctrine with "an inflexible inquiry into the relative proximity of the challenged activity to the corporation's stated purposes"). The savings clause in CA §1-403(d) retained the ability of the State to assert that a corporation was acting *ultra vires* in a *quo warranto* action. It is presumed that the State would undertake such an action when *ultra vires* actions of a corporation "menace the public welfare." *Id.*, §4.09.

Our research has not uncovered any cases in which states have exercised this power in the approximately 60 years since it originally appeared in the Model Business Corporation Act.[8]

### E. *Authority of State Agencies with Respect to CEG Executive Compensation*

You also asked what State agencies might have authority to take some action with respect to executive compensation at CEG. One of CEG's subsidiaries, Baltimore Gas and Electric ("BGE"), is a regulated public service company in Maryland. The Public Service Commission ("PSC") is charged with regulating public utilities. PSC has exercised its jurisdiction under Annotated Code of Maryland, Public Utility Companies Article, §4-208 to require public utilities, such as BGE, to report costs that have been allocated to them by their corporate parents. *See* COMAR 20.40.02.07. Although the General Assembly has expressed clear concern about the impact on a utility's capital structure of transactions entered into by the utility's corporate parent, it is not clear (and beyond the scope of this letter) whether the PSC has authority to disallow particular cost allocations to the public utility from its corporate parent on the sole basis that the PSC deems such costs to be excessive. It is clear, however, that the PSC has jurisdiction to disallow the inclusion of costs in the utility's rate base for rate making purposes. *See* Public Service Commission, *In the Matter of the Current and Future Financial Condition of Baltimore Gas and Electric Company*, Case No. 99173 ( Phase II), Order No. 82986 (October 30, 2009) at pp. 30-31 (questioning "the wisdom of paying anyone millions of dollars per year given CEG's recent history," but finding its role limited to regulating the portion of executive compensation assessed to ratepayers). In other words, although it is unclear whether under current law the PSC could protect BGE ratepayers from indirect harms associated with the weakening of BGE's capital structure as a result of the utility bearing the costs of excessive executive compensation, the PSC undoubtedly may protect ratepayers from having to bear those costs directly.

---

[8] A survey of the states in the mid-1980s uncovered no use of the provision in recent memory. *See* Schaeftler, *Ultra Vires – Ultra Useless: The Myth of State Interest in Ultra Vires Acts of Business Corporations*, 9 J. Corp. L. 81, 91 (1984).

### F.    Summary

Excessive executive compensation may constitute a waste of corporate assets. To the extent that decisions concerning executive compensation come before the courts, they are litigated through the mechanism of a shareholder derivative suit. However, the business judgment rule insulates most such decisions from review by the courts.

While the Model Business Corporation Act, and its Maryland version (CA §1-403(d)), preserved the ability of a state Attorney General to bring a *quo warranto* action to forfeit a corporate charter or enjoin unauthorized actions of a corporation, we are aware of no precedent for such an action challenging the decisions of the board of directors of a private corporation relating to executive compensation. CA §1-403(d) is a remnant of the *ultra vires* doctrine that allows reversal of corporate action not authorized by a corporation's charter or governing law. Any action brought under that statute must be based on a corporate action that can be characterized as *ultra vires* – not just unlawful – and that implicates a public interest at stake in the particular decision. While the decisions concerning executive compensation at CEG may perhaps be criticized on fairness and policy grounds, the clearest public interest at stake is the effect of such compensation decisions on BGE ratepayers. Under current law, the assessment of that issue is a matter, in the first instance, for the PSC.

## III

## Power of the General Assembly
## to Regulate Executive Compensation

You asked whether the General Assembly could lawfully restrict executive compensation at a company like CEG. The General Assembly may certainly amend Maryland law in ways that can regulate executive compensation at Maryland corporations. Such legislation could take a number of forms – enhanced disclosure requirements, elimination of favorable tax treatment or imposition of adverse tax consequences related to executive compensation, or explicit caps on certain types of compensation.

For example, the Legislature could adopt enhanced disclosure requirements for public utilities. Alternatively, as has been proposed several times in recent years in the General Assembly, it could eliminate deductions from corporate taxes for expenses associated

with excessive executive compensation. *See, e.g.*, Senate Bill 472 (2009). Or it could devise a tax that targets excessive compensation. There are other possible measures that might impose some limits on executive compensation at a company like CEG – for example, a cap on ratepayer contribution to executive compensation or a statute clearly establishing the PSC's authority to disallow cost allocation to a public utility from its corporate parent.

The Legislature might also enact specific guidelines for executive compensation at corporations or at specific classes of corporations. For example, it has provided for State oversight of compensation decisions at nonprofit health service plans. *See* Annotated Code of Maryland, Insurance Article ("IN"), §14-139. Such entities have a public mission to "provide affordable and accessible health insurance ... [to] assist and support public and private health care initiatives for individuals without health insurance; and [to] promote the integration of a health care system that meets the health care needs of all the residents ..." IN §14-102(c). Under the statute, an executive of such an entity may only receive "fair and reasonable compensation in the form of salary, bonuses, or perquisites for work performed for the benefit of the corporation." IN §14-139(c). The statute requires the compensation committee of such an entity to develop compensation guidelines to be approved by its board of directors and provided to the entity's regulator, the State Insurance Commissioner. IN §114-139(d). The Insurance Commissioner is to review the compensation actually paid to executives and may prohibit payment if the Commissioner finds that the pay exceeds the statutory guidelines. *Id*. If the statute is violated, the Commissioner can take enforcement action that could result in the assessment of monetary penalties and payment of restitution. IN §14-139(f).[9]

---

[9] Acting under the authority provided by this statute, the Maryland Insurance Commissioner prohibited CareFirst, Inc., from paying part of a proposed past-termination payment to its former CEO. *Insurance Commissioner v. CareFirst, Inc.,* et al., MIA-2007-10-027 (July 14, 2008), available at http://www.mdinsurance.state.md.us/sa/documents/MIA-2007-10-027-CareFirstFinalOrderall07-08.pdf. The Baltimore County circuit court later reversed that decision and the case is now on appeal.

Last year, the Commissioner upheld a decision of the board of CareFirst, Inc. to deny payment of a SERP and other post-employment compensation to one of the entity's former executives. In re: Investigation

(continued...)

We caution that a bill designed to restrict compensation at a single corporation may raise equal protection issues[10] or a question as to whether it is a special law forbidden by the State Constitution. *See* Maryland Constitution, Article III, §33. An effort to undo existing compensation arrangements at a particular company may also raise issues as to whether it impairs contracts or vested rights. *See* 88 *Opinions of the Attorney General* 11, 18-24 (2003) (analyzing impairment of contract and vested rights issues with respect to "anti-bonus" provision in law governing conversion of non-profit health service plans to for-profit status).

Should you wish to introduce legislation, the Attorney General's Office is willing, of course, to review any such proposals and advise whether specific proposals may be susceptible to constitutional challenges.

## IV

## Conclusion

In summary, based on the analysis above, the answers to the legal questions you posed are as follows:

★ Excessive executive compensation may constitute a "waste" of corporate assets.

★ The courts usually defer to decisions of a board of directors on an issue such as executive compensation under the "business judgment rule," also referred to by the Court of Appeals as the "principle of non-intervention." This principle depends in part on whether the directors acted in good faith.

---

[9] (...continued)
of Proposed Post-Termination Payment by Care First, Inc., to Leon Kaplan (February 5, 2009), available at http://www.mdinsurance. state.md.us/sa/ documents/MIA-2009-02-002-CareFirst-Kaplan.pdf.

[10] Such issues are likely to be assessed on a rational basis standard. *See Retail Industry Leaders Ass'n v. Fielder*, 435 F.Supp. 2d 481, 498-501 (D.Md. 2006), *aff'd*, 475 F.3d 180 (4th Cir. 2007).

★ Allegations of corporate waste are typically litigated in the context of a shareholder derivative action, rather than a *quo warranto* action.

★ CA §1-403(d) was part of the Model Business Corporation Act, as adopted in Maryland some years ago. Under that statute, the Attorney General retains authority to seek injunctive relief or dissolution of a corporation that engages in unauthorized or "*ultra vires*" actions. There are few cases in the last century in which state Attorneys General have exercised this authority and none challenging corporate decisions as to executive compensation.

★ The General Assembly has authority to enact legislation regulating executive compensation at Maryland corporations and businesses. There will be issues of retroactivity and vested rights to the extent such legislation attempted to alter compensation due under existing agreements.

Douglas F. Gansler
*Attorney General*

Robert N. McDonald
*Chief Counsel*
*Opinions and Advice*

***Editor's Note:***

This opinion was originally issued as a letter of advice with appendices that contained factual information about the chief executive officer's compensation.

*Jones v. Harris Associates, L.P.*, mentioned in Part I of this opinion, was later vacated and remanded by the Supreme Court. 2010 WL 1189560 (March 30, 2010), consistent with the dissenting opinion quoted in the text.