*522 Justice Scalia
delivered the opinion of the Court.
In 2005, Eliot Spitzer, Attorney General for the State of New York, sent letters to several national banks making a *523 request “in lieu of subpoena” that they provide certain nonpublic information about their lending practices. He sought this information to determine whether the banks had violated the State’s fair-lending laws. Spitzer’s successor in office, Andrew Cuomo, is the petitioner here. Respondents, the federal Office of the Comptroller of the Currency (Comptroller or OCC) and the Clearing House Association, a banking trade group, brought suit to enjoin the information request, claiming that the Comptroller’s regulation promulgated under the National Bank Act prohibits that form of state law enforcement against national banks.
The United States District Court for the Southern District of New York entered an injunction in favor of respondents, prohibiting the Attorney General from enforcing state fair-lending laws through demands for records or judicial proceedings. The United States Court of Appeals for the Second Circuit affirmed. 510 F. 3d 105 (2007). We granted certiorari. 555 U. S. 1130 (2009). The question presented is whether the Comptroller’s regulation purporting to pre *524 empt state law enforcement can be upheld as a reasonable interpretation of the National Bank Act.
I
Section 484(a) of Title 12 U. S. C., a provision of the National Bank Act, 13 Stat. 99, reads as follows:
“No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.”
The Comptroller, charged with administering the National Bank Act, adopted, through notice-and-comment rulemaking, the regulation at issue here designed to implement the statutory provision. Its principal provisions read as follows:
“§ 7.4000 Visitorial powers.
“(a) General rule. (1) Only the OCC or an authorized representative of the OCC may exercise visitorial powers with respect to national banks, except as provided in paragraph (b) of this section. State officials may not exercise visitorial powers with respect to national banks, such as conducting examinations, inspecting or requiring the production of books or records of national banks, or prosecuting enforcement actions, except in limited circumstances authorized by federal law. However, production of a bank’s records (other than nonpublic OCC information under 12 CFR part 4, subpart C) may be required under normal judicial procedures.
“(2) For purposes of this section, visitorial powers include:
“(i) Examination of a bank;
“(ii) Inspection of a bank’s books and records;
“(iii) Regulation and supervision of activities authorized or permitted pursuant to federal banking law; and
*525 “(iv) Enforcing compliance with any applicable federal or state laws concerning those activities.” 12 CFR §7.4000 (2009).
By its clear text, this regulation prohibits the States from “prosecuting enforcement actions” except in “limited circumstances authorized by federal law.”
Under the familiar Chevron framework, we defer to an agency’s reasonable interpretation of a statute it is charged with administering. Chevron U S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). There is necessarily some ambiguity as to the meaning of the statutory term “visitorial powers,” especially since we are working in an era when the prerogative writs — through which visitorial powers were traditionally enforced — are not in vogue. The Comptroller can give authoritative meaning to the statute within the bounds of that uncertainty. But the presence of some uncertainty does not expand Chevron deference to cover virtually any interpretation of the National Bank Act. We can discern the outer limits of the term “visitorial powers” even through the clouded lens of history. They do not include, as the Comptroller’s expansive regulation would provide, ordinary enforcement of the law. Evidence from the time of the statute’s enactment, a long line of our own cases, and application of normal principles of construction to the National Bank Act make that clear.
A
Historically, the sovereign’s right of visitation over corporations paralleled the right of the church to supervise its institutions and the right of the founder of a charitable institution “to see that [his] property [was] rightly employed,” 1 W. Blackstone, Commentaries on the Laws of England 469 (1765). By extension of this principle, “[t]he king [was] by law the visitor of all civil corporations,” ibid. A visitor could inspect and control the visited institution at will.
*526 When the National Bank Act was enacted in 1864, “visitation” was accordingly understood as “[t]he act of examining into the affairs of a corporation” by “the government itself.” 2 J. Bouvier, A Law Dictionary 790 (15th ed. 1883). Lower courts understood “visitation” to mean “the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations.” First Nat. Bank of Youngstown v. Hughes, 6 F. 737, 740 (CC ND Ohio 1881). A State was the “visitor” of all companies incorporated in the State, simply by virtue of the State’s role as sovereign: The “legislature is the visitor of all corporations founded by it.” Guthrie v. Harkness, 199 U. S. 148, 157 (1905) (internal quotation marks omitted).
This relationship between sovereign and corporation was understood to allow the States to use prerogative writs— such as mandamus and quo warranto — to exercise control “whenever a corporation [wa]s abusing the power given it ... or acting adversely to the public, or creating a nuisance.” H. Wilgus, Private Corporations, in 8 American Law and Procedure § 157, pp. 224-225 (J. Hall ed. 1910). State visitorial commissions were authorized to “exercise a general supervision” over companies in the State. I. Wormser, Private Corporations § 80, pp. 100, 101, in 4 Modern American Law (1921).
B
Our cases have always understood “visitation” as this right to oversee corporate affairs, quite separate from the power to enforce the law. In the famous Dartmouth College case, Justice Story, describing visitation of a charitable corporation, wrote that Dartmouth was “subject to the controling authority of its legal visitor, who.. . . may amend and repeal its statutes, remove its officers, correct abuses, and generally superintend the management of [its] trusts,” and who is “liable to no supervision or control.” Trustees of *527 Dartmouth College v. Woodward, 4 Wheat. 518, 676, 681 (1819) (concurring opinion). This power of “genera[l] superintend[ence]” stood in contrast to action by the court of chancery, which acted “not as itself possessing a visitorial power . . . but as possessing a general jurisdiction ... to redress grievances, and frauds.” Id., at 676.[1]
In Guthrie, supra, we held that a shareholder acting in his role as a private individual was not exercising a “visitorial power” under the National Bank Act when he petitioned a court to force the production of corporate records, id., at 159. “[Cjontrol in the courts of justice,” we said, is not visitorial, and we drew a contrast between the nonvisitorial act of “su[ing] in the courts of the State” and the visitorial “supervision of the Comptroller of the Currency,” id., at 159, 157.
In First Nat. Bank in St. Louis v. Missouri, 263 U. S. 640 (1924), we upheld the right of the Attorney General of Missouri to bring suit to enforce a state anti-bank-branching law against a national bank. We said that only the United States may perform visitorial administrative oversight, such as “inquiring] by quo warranto whether a national bank is acting in excess of its charter powers.” Id., at 660. But if a state statute of general applicability is not substantively *528 pre-empted, then “the power of enforcement must rest with the [State] and not with” the National Government, ibid.[2]
Our most recent decision, Watters v. Wachovia Bank, N. A., 550 U. S. 1 (2007), does not, as the dissent contends, post, at 552, “suppor[t] OCC’s construction of the statute.” To the contrary, it is fully in accord with the well established distinction between supervision and law enforcement. Watters held that a State may not exercise “ ‘general supervision and control’ ” over a subsidiary of a national bank, 550 U. S., at 8, because “multiple audits and surveillance under rival oversight regimes” would cause uncertainty, id., at 21. “[G]eneral supervision and control” and “oversight” are worlds apart from law enforcement. All parties to the case agreed that Michigan’s general oversight regime could not be imposed on national banks; the sole question was whether operating subsidiaries of national banks enjoyed the same immunity from state visitation. The opinion addresses and answers no other question.
The foregoing cases all involve enforcement of state law. But if the Comptroller’s exclusive exercise of visitorial powers precluded law enforcement by the States, it would also preclude law enforcement by federal agencies. Of course it does not. See, e. g., Bank of America Nat. Trust & Sav. Assn. v. Douglas, 105 F. 2d 100, 105-106 (CADC 1939) (Secu *529 rities Exchange Commission investigation of bank fraud is not an exercise of “visitorial powers”); Peoples Bank of Danville v. Williams, 449 F. Supp. 254, 260 (WD Va. 1978) (same).
In sum, the unmistakable and utterly consistent teaching of our jurisprudence, both before and after enactment of the National Bank Act, is that a sovereign’s “visitorial powers” and its power to enforce the law are two different things. There is not a credible argument to the contrary. And contrary to what the Comptroller’s regulation says, the National Bank Act pre-empts only the former.
C
The consequences of the regulation also cast doubt upon its validity. No one denies that the National Bank Act leaves in place some state substantive laws affecting banks. See Brief for Federal Respondent 20; Brief for Respondent Clearing House Association, L. L. C. 29; post, at 552. But the Comptroller’s rule says that the State may not enforce its valid, non-pre-empted laws against national banks. Post, at 552-553. The bark remains, but the bite does not.
The dissent admits, with considerable understatement, that such a result is “unusual,” post, at 556. “Bizarre” would be more apt. As the Court said in St. Louis:
“To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law.” 263 U. S., at 660.
In sharp contrast to the “unusual” reading propounded by the Comptroller’s regulation, reading “visitorial powers” as limiting only sovereign oversight and supervision would produce an entirely commonplace result — the precise result contemplated by our opinion in St. Louis, which said that if a state statute is valid as to national banks, “the corollary that it is obligatory and enforceable necessarily results.” *530 Id., at 659-660 (emphasis added). Channeling state attorneys general into judicial law-enforcement proceedings (rather than allowing them to exercise “visitorial” oversight) would preserve a regime of exclusive administrative oversight by the Comptroller while honoring in fact rather than merely in theory Congress’s decision not to pre-empt substantive state law. This system echoes many other mixed state/federal regimes in which the Federal Government exercises general oversight while leaving state substantive law in place. See, e. g., Wyeth v. Levine, 555 U. S. 555 (2009).
This reading is also suggested by § 484(a)’s otherwise inexplicable reservation of state powers “vested in the courts of justice.” As described earlier, visitation was normally conducted through use of the prerogative writs of mandamus and quo warranto. The exception could not possibly exempt that manner of exercising visitation, or else the exception would swallow the rule. Its only conceivable purpose is to preserve normal civil and criminal lawsuits. To be sure, the reservation of powers “vested in the courts of justice” is phrased as an exception from the prohibition of visitorial powers. But as we have just discussed, it cannot possibly be that, and it is explicable only as an attempt to make clear that the courts’ ordinary powers of enforcing the law are not affected.[3]
*531 On a pragmatic level, the difference between visitation and law enforcement is clear. If a State chooses to pursue enforcement of 'its laws in court, then it is not exercising its power of visitation and will be treated like a litigant. An attorney general acting as a civil litigant must file a lawsuit, survive a motion to dismiss, endure the rules of procedure and discovery, and risk sanctions if his claim is frivolous or his discovery tactics abusive. Judges are trusted to prevent “fishing expeditions” or an undirected rummaging through bank books and records for evidence of some unknown wrongdoing. In New York, civil discovery is far more limited than the full range of “visitorial powers” that may be exercised by a sovereign. Courts may enter protective orders to prevent “unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice,” N. Y. Civ. Prac. Law Ann. § 3103(a) (West 2005), and may supervise discovery sua sponte, § 3104(a). A visitor, by contrast, may inspect books and records at any time for any or no reason.
II
The Comptroller’s regulation, therefore, does not comport with the statute. Neither does the Comptroller’s interpretation of its regulation, which differs from the text and must be discussed separately.
Evidently realizing that exclusion of state enforcement of all state laws against national banks is too extreme to be contemplated, the Comptroller sought to limit the sweep of its regulation by the following passage set forth in the agency’s statement of basis and purpose in the Federal Register:
‘What the case law does recognize is that ‘states retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law.’ [citing a Ninth Circuit case.] Application of these laws to national banks and their implementation by state *532 authorities typically does not affect the content or extent of the Federally-authorized business of banking ... but rather establishes the legal infrastructure that surrounds and supports the ability of national banks . . . to do business.” 69 Fed. Reg. 1896 (2004) (footnote omitted).
This cannot be reconciled with the regulation’s almost categorical prohibition in 12 CFR § 7.4000(a)(1) of “prosecuting enforcement actions.”[4] Nor can it be justified by the provision in subsection (a)(2)(iv) which defines visitorial powers to include “[e]nforcing compliance with any applicable . . . state laws concerning” “activities authorized or permitted pursuant to federal banking law,” § 7.4000(a)(2)(iii). The latter phrase cannot be interpreted to include only distinctively banking activities (leaving the States free to enforce non-banking state laws), because if it were so interpreted subsection (a)(2)(iii), which uses the same terminology, would limit the Comptroller’s exclusive visitorial power of “[rjegulation and supervision” to distinctively banking activities — which no one thinks is the case. Anyway, the National Bank Act does specifically authorize and permit activities that fall within what the statement of basis and purpose calls “the legal infrastructure that surrounds and supports the ability *533 of national banks ... to do business.” See, e. g., 12 U. S. C. § 24 Third (power to make contracts); § 24 Seventh (“all such incidental powers as shall be necessary to carry on the business of banking”). And of course a distinction between “implementation” of “infrastructure” and judicial enforcement of other laws can be found nowhere within the text of the statute. This passage in the statement of basis and purpose, resting upon neither the text of the regulation nor the text of the statute, attempts to do what Congress declined to do: exempt national banks from all state banking laws, or at least state enforcement of those laws.
Ill
The dissent fails to persuade us. Its fundamental contention — that the exclusive grant of visitorial powers can be interpreted to preclude state enforcement of state laws — rests upon a logical fallacy. The dissent establishes, post, at 541-543 (and we do not at all contest), that in the course of exercising visitation powers the sovereign can compel compliance with the law. But it concludes from that, post, at 545, that any sovereign attempt to compel compliance with the law can be deemed an exercise of the visitation power. That conclusion obviously does not follow. For example, in the course of exercising its visitation powers, the sovereign can assuredly compel a bank to honor obligations that are in default. Does that mean that the sovereign’s taking the same action in executing a civil judgment for payment of those obligations can be considered an exercise of the visitation power? Of course not. Many things can be compelled through the visitation power that can be compelled through, the exercise of other sovereign power as well. The critical question is not what is being compelled, but what sovereign power has been invoked to compel it. And the power to enforce the law exists separate and apart from the power of visitation.
The dissent argues that the Comptroller’s expansive reading of “visitorial powers” does not intrude upon “ ‘the his *534 toric police powers of the States/ ” post, at 554 (quoting Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230 (1947)), because, like federal maritime law, federal involvement in this field dates to “ ‘the earliest days of the Republic/ ” post, at 555 (quoting United States v. Locke, 529 U. S. 89,108 (2000)). For that reason, the dissent concludes, this case does not raise the sort of federalism concerns that prompt a presumption against pre-emption. We have not invoked the presumption against pre-emption, and think it unnecessary to do so in giving force to the plain terms of the National Bank Act. Neither, however, should the incursion that the Comptroller’s regulation makes upon traditional state powers be minimized. Although the sovereign visitorial power of assuring national-bank compliance with all laws inhered in the Federal Government from the time of its creation of national banks, the Comptroller was not given authority to enforce non-pre-empted state laws until 1966. See Financial Institutions Supervisory Act of 1966, Tit. III, 80 Stat. 1046-1055. A power first exercised during the lifetime of every current Justice is hardly involvement “from the earliest days of the Republic.”
States, on the other hand, have always enforced their general laws against national banks — and have enforced their banking-related laws against national banks for at least 85 years, as evidenced by St. Louis, in which we upheld enforcement of a state anti-bank-branching law, 263 U. S., at 656. See also Anderson Nat. Bank v. Luckett, 321 U. S. 233, 237, 248-249 (1944) (state commissioner of revenue may enforce abandoned-bank-deposit law against national bank through “judicial proceedings”); State ex rel. Lord v. First Nat. Bank of St. Paul, 313 N. W. 2d 390, 393 (Minn. 1981) (state treasurer may enforce general unclaimed-property law with “specific provisions directed toward” banks against national bank); Clovis Nat. Bank v. Callaway, 69 N. M. 119, 130-132, 364 P. 2d 748, 756 (1961) (state treasurer may enforce *535 unclaimed-property law against national-bank deposits); State v. First Nat. Bank of Portland, 61 Ore. 551, 554-557, 123 P. 712, 714 (1912) (state attorney general may enforce bank-specific escheat law against national bank).[5]
The dissent seeks to minimize the regulation’s incursion upon state powers by claiming that the regulation does not “declare the pre-emptive scope of the [National Bank Act]” but merely “interpret^] the term ‘visitorial powers.’ ” Post, at 555. That is much too kind. It is not without reason that the regulation is contained within a subpart of the Comptroller’s regulations on “Bank Activities and Operations” that is entitled “Preemption.” The purpose and function of the statutory term “visitorial powers” is to define and thereby limit, the category of action reserved to the Federal Government and forbidden to the States. Any interpretation of “visitorial powers” necessarily “declares the preemptive scope of the NBA,” ibid. What is clear from logic is also clear in application: The regulation declares that “[s]tate officials may not . . . proseeut[e] enforcement actions.” 12 CFR § 7.4000(a). If that is not pre-emption, nothing is.
IV
Applying the foregoing principles to this case is not difficult. “Visitorial powers” in the National Bank Act refers to a sovereign’s supervisory powers over corporations. They include any form of administrative oversight that allows a sovereign to inspect books and records on demand, even if the process is mediated by a court through prerogative writs or similar means. The Comptroller reasonably interpreted this statutory term to include “conducting examinations [and] inspecting or requiring the production of books or rec *536 ords of national banks,” §7.4000, when the State conducts those activities in its capacity as supervisor of corporations.
When, however, a state attorney general brings suit to enforce state law against a national bank, he is not acting in the role of sovereign-as-supervisor, but rather in the role of sovereign-as-law-enforcer. Such a lawsuit is not an exercise of “visitorial powers,” and thus the Comptroller erred by extending the definition of “visitorial powers” to include “prosecuting enforcement actions” in state courts, §7.4000.
The request for information in the present case was stated to be “in lieu of” other action; implicit was the threat that if the request was not voluntarily honored, that other action would be taken. All parties have assumed, and we agree, that if the threatened action would have been unlawful the request-cum-threat could be enjoined. Here the threatened action was not the bringing of a civil suit, or the obtaining of a judicial search warrant based on probable cause, but rather the Attorney General’s issuance of subpoena on his own authority under New York Executive Law, which permits such subpoenas in connection with his investigation of “repeated fraudulent or illegal acts ... in the carrying on, conducting or transaction of business.” See N. Y. Exec. Law Ann. §63(12) (West 2002). That is not the exercise of the power of law enforcement “vested in the courts of justice” which 12 U. S. C. § 484(a) exempts from the ban on exercise of supervisory power.
Accordingly, the injunction below is affirmed as applied to the threatened issuance of executive subpoenas by the Attorney General for the State of New York, but vacated insofar as it prohibits the Attorney General from bringing judicial enforcement actions.
* * *
The judgment of the Court of Appeals is affirmed in part and reversed in part.

It is so ordered.

 Justice Thomas’s opinion concurring in part and dissenting in part (hereinafter the dissent) attempts to distinguish Dartmouth College on the ground that the college was a charitable corporation, whose visitors (unlike the State as visitor of for-profit corporations) had no law-enforcement power. See post, at 543, n. 1. We doubt that was so. As Justice Story’s opinion in Dartmouth College stated, visitors of charitable corporations had “power to . . . correct all irregularities and abuses,” 4 Wheat., at 673, which would surely include operations in violation of law. But whether or not visitors of charitable corporations had law-enforcement powers, the powers that they did possess demonstrate that visitation is different from ordinary law enforcement. Indeed, if those powers did not include the power to assure compliance with law that demonstration would be all the more forceful.

 The dissent attempts to distinguish St. Louis by invoking the principle that an agency is free to depart from a court’s interpretation of the law. Post, at 550-551 (citing National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 983 (2005)). This again misses the point. St. Louis is relevant to proper interpretation of 12 U. S. C. § 484(a) not because it is authoritative on the question whether States can enforce their banking laws, but because it is one in a long and unbroken line of cases distinguishing visitation from law enforcement. Respondents contend that St. Louis holds only that States can enforce their law when federal law grants the national bank no authority to engage in the activity at issue. Even if that were true it would make no difference. The ease would still stand for the proposition that the exclusive federal power of visitation does not prevent States from enforcing their law.

 We reject respondents’ contention that the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, § 102(f)(1)(B), 108 Stat. 2349, 12 U. S. C. § 36(f)(1)(B), establishes that the Comptroller’s visitorial power pre-empts state law enforcement. That provision states that some state laws respecting bank branching “shall be enforced” by the Comptroller. We need not decide here whether converting the Comptroller's visitorial power to assure compliance with all applicable laws, see infra, at 534, into an obligation to assure compliance with certain state laws preempts state enforcement of those particular laws. Even if it had that effect it would shed no light on the meaning of “visitorial powers” in the National Bank Act, a statute that it does not refer to and that was enacted more than a century earlier.

 The prohibition is not entirely categorical only because it is subject to the phrase at the end of the sentence (applicable to all of the regulation’s enumerated “visitorial powers” forbidden to the States): “except in limited circumstances authorized by federal law.” This replicates a similar exception contained in 12 U. S. C. § 484(a) itself (“No national bank shall be subject to any visitorial powers except as authorized by Federal law”), and certainly does not refer to case law finding state action non-preempted. If it meant that, §484(a)’s apparent limitation of visitorial powers would be illusory — saying, in effect, that national banks are subject to only those visitorial powers that the courts say they are subject to. Cases that find state action non-pre-empted might perhaps be described as “permitting” the state action in question, but hardly as “authorizing” it. In both the statutory and regulation context, “federal law” obviously means federal statutes.

 All of these eases were decided before Congress added to §484 its current subsection (b), which authorizes “State auditors and examiners” to review national-bank records to assure compliance with state unclaimed-property and escheat laws. See 96 Stat. 1521.