184 Cal.App.4th 652 (2010)
109 Cal.Rptr.3d 248
ALLAN PARKS, Plaintiff and Appellant,
v.
MBNA AMERICA BANK, N.A., Defendant and Respondent.
No. G040798.
Court of Appeals of California, Fourth District, Division Three.
May 12, 2010.
*655 Rosner & Mansfield, Law Office of Michael R. Vachon and Michael R. Vachon for Plaintiff and Appellant.
Arnold & Porter, Laurence J. Hutt, Teri R. Richardson and Christopher S. Tarbell for Defendant and Respondent.
Edmund G. Brown, Jr., Attorney General, Frances T. Grunder, Assistant Attorney General, Kathrin Sears and Sheldon H. Jaffe, Deputy Attorneys General, for the Attorney General of the State of California as Amicus Curiae upon the request of the Court of Appeal.
Horace G. Sneed and Douglas B. Jordan for the Office of the Comptroller of the Currency Administrator of National Banks as Amicus Curiae upon the request of the Court of Appeal.

*656 OPINION
IKOLA, J.
Civil Code section 1748.9 (section 1748.9) requires credit card issuers engaged in extending credit to cardholders by means of a "preprinted check or draft" (known as "convenience checks" in the industry) to "disclose on the front of an attachment that is affixed by perforation or other means to the preprinted check or draft, in clear and conspicuous language, all of the following information: [¶] (1) That `use of the attached check or draft will constitute a charge against your credit account.' [¶] (2) The annual percentage rate and the calculation of finance charges, as required by Section 226.16 of Regulation Z of the Code of Federal Regulations, associated with the use of the attached check or draft. [¶] (3) Whether the finance charges are triggered immediately upon the use of the check or draft."
Alleging systematic violations of section 1748.9, plaintiff Allan Parks filed a class action lawsuit against defendant MBNA America Bank, N.A. (MBNA),[1] for its purportedly unlawful business practices under Business and Professions Code section 17200 et seq. MBNA is a national banking association, organized under the laws of the United States and regulated by the Office of the Comptroller of the Currency (OCC). (See 12 U.S.C. § 1 et seq.) The trial court granted judgment on the pleadings to MBNA, following Rose v. Chase Bank USA, N.A. (9th Cir. 2008) 513 F.3d 1032 (Rose) in finding section 1748.9 preempted by federal law applicable to national banks. We conclude section 1748.9 is not, on its face, preempted and therefore reverse. Section 1748.9 does not preclude national banks from exercising their authority to lend money on personal security under section 24 of title 12 of the United States Code (par. Seventh). Furthermore, without a factual record, a court cannot conclude that section 1748.9 significantly impairs national banks' authorized activities.[2]

FACTS
As the court granted judgment on the pleadings to MBNA, we assume the truth of, and liberally construe, all properly pleaded factual allegations in Parks's complaint. (Stone Street Capital, LLC v. California State Lottery Com. (2008) 165 Cal.App.4th 109, 116 [80 Cal.Rptr.3d 326] (Stone Street).)
In February 2003, MBNA issued a credit card to Parks. MBNA sent several preprinted drafts to his residence (and the residences of other similarly situated proposed class members) in late 2003. The drafts sent to *657 Parks and the other proposed class members did not contain any of the three disclosures required by section 1748.9. Parks used two of the preprinted drafts; other proposed class members used drafts sent to them. Parks (and the other class members) incurred finance charges and interest charges for each transaction, as interest accrued as of the date of the transactions (there was no "grace period" as is typical in credit card transactions).
Parks, on behalf of himself and all others similarly situated, sued MBNA in June 2004 for its alleged violations of Business and Professions Code section 17200 et seq. Several years into the litigation, MBNA renewed a previously rejected motion for judgment on the pleadings, basing its renewed motion on subsequent case lawRose, supra, 513 F.3d 1032. The court granted MBNA's motion and entered judgment against Parks.

DISCUSSION
We review the judgment de novo, as it was based on the trial court's grant of MBNA's motion for judgment on the pleadings. (Stone Street, supra, 165 Cal.App.4th at p. 116.)
In all material respects, Rose, supra, 513 F.3d 1032, is factually identical to the case before us. In Rose, class action plaintiffs sued Chase Bank USA, N.A. (Chase), for its alleged violations of section 1748.9. (Rose, at pp. 1034-1035.) The convenience checks provided by Chase to its cardholders lacked disclosures required under section 1748.9. (Rose, at p. 1035.) The district court granted Chase's motion for judgment on the pleadings and the Ninth Circuit Court of Appeals affirmed. (Id. at p. 1036.) Both courts held federal law preempted section 1748.9 as applied to national banks. (Rose, at pp. 1037-1038; Rose v. Chase Manhattan Bank USA (C.D.Cal. 2005) 396 F.Supp.2d 1116, 1122-1123.)
(1) Parks asserts Rose was wrongly decided. We are not bound to follow federal court precedent; however, "`numerous and consistent'" federal decisions may be particularly persuasive when they interpret federal law. (Etcheverry v. Tri-Ag Service, Inc. (2000) 22 Cal.4th 316, 320-321 [93 Cal.Rptr.2d 36, 993 P.2d 366], overruled on another ground in Bates v. Dow Agrosciences LLC (2005) 544 U.S. 431, 437, 452 [161 L.Ed.2d 687, 125 S.Ct. 1788].) If we are persuaded federal law preempts section 1748.9 as applied to national banks, the supremacy clause (U.S. Const., art. VI, cl. 2) obligates this court to honor federal law by holding section 1748.9 inapplicable to MBNA.

Uncontroverted Legal Framework
(2) We begin our analysis by setting forth several uncontroversial propositions. First, "federal law can preempt state law in one of three ways: *658 (1) expressly; (2) by actually conflicting with state law; or (3) by exclusively occupying a legislative field." (Miller v. Bank of America, N.A. (U.S.A.)) (2009) 170 Cal.App.4th 980, 984 [88 Cal.Rptr.3d 723] (Miller), some italics added.)
(3) Second, federal banking law sometimes, but not always, preempts state regulation as applied to national banks. "Business activities of national banks are controlled by the National Bank Act (NBA or Act), 12 U.S.C. § 1 et seq., and regulations promulgated thereunder by the [OCC]. [Citations.] As the agency charged by Congress with supervision of the NBA, OCC oversees the operations of national banks and their interactions with customers." (Watters v. Wachovia Bank, N.A. (2007) 550 U.S. 1, 6 [167 L.Ed.2d 389, 127 S.Ct. 1559] (Watters).) "[F]ederal control shields national banking from unduly burdensome and duplicative state regulation. [Citation.] Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." (Id. at p. 11.)
(4) Third, national banks are authorized by the NBA "to carry on the business of banking . . . by loaning money on personal security . . . ." (12 U.S.C. § 24 (par. Seventh).) It is uncontested that federal law authorizes MBNA to extend credit by way of convenience checks to Parks and other credit card customers. (Cf. Smiley v. Citibank (1995) 11 Cal.4th 138, 146-147 [44 Cal.Rptr.2d 441, 900 P.2d 690] ["It is clear that national banks are authorized to conduct credit card programs, to issue credit cards to holders, and to provide money thereunder to such persons and to others on their behalf in exchange for goods or services."].) But there is no reference to state law in the text of the The National Bank Act (NBA; June 3, 1864, ch. 106, 13 Stat. 99) with regard to the business of loaning money on personal security. The NBA does not explicitly answer whether state law requiring particular disclosures in connection with convenience checks is preempted.
Fourth, OCC issued regulations in 2004 that purport to explain which state laws pertaining to non-real-estate lending powers of national banks are preempted. In relevant part, these regulations provide: "(1) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks. [¶] (2) A national bank may make non-real estate loans without regard to state law limitations concerning: [¶] . . . [¶] (viii) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents." (12 C.F.R. § 7.4008(d) (2010).) "State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national *659 banks to the extent that they only incidentally affect the exercise of national banks' non-real estate lending powers: [¶] (1) Contracts; [¶] (2) Torts; [¶] (3) Criminal law; [¶] (4) Rights to collect debts; [¶] (5) Acquisition and transfer of property; [¶] (6) Taxation; [¶] (7) Zoning; and [¶] (8) Any other law the effect of which the OCC determines to be incidental to the non-real estate lending operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section." (12 C.F.R. § 7.4008(e) (2010), fn. omitted.)[3]
(5) Fifth, the federal Truth in Lending Act (TILA), title 15 of the United States Code section 1601 et seq., and its accompanying regulations (Regulation Z), 12 Code of Federal Regulations part 226.1 et seq. (2009), require specific disclosures by businesses offering consumer credit (including national banks issuing credit cards). TILA grants the Board of Governors of the Federal Reserve System (and not OCC) power to prescribe regulations and carry out the purposes of TILA. (15 U.S.C. §§ 1602(b), 1604(a).) MBNA is compelled by TILA and Regulation Z (not to mention contract law) to disclose the terms of the convenience checks it offers to consumers. But nothing in federal law specifies that such disclosures must be provided in "an attachment that is affixed by perforation or other means to the preprinted check or draft . . . ." (§ 1748.9, subd. (a).) Moreover, nothing requires use of the precise language required in section 1748.9, subdivision (a)(1)"That `use of the attached check or draft will constitute a charge against your credit account.'" Subject to certain exceptions, TILA does not "annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." (15 U.S.C. § 1610(a)(1).) Neither party contends section 1748.9 is preempted by TILA or is otherwise inconsistent with TILA.

The Rose Cases Holding Section 1748.9 Is Preempted

The district and circuit courts in Rose engaged in slightly different analyses. The Ninth Circuit observed that Congress explicitly granted national banks the power to loan money on personal security and that Chase exercised this power by extending credit via convenience checks. (Rose, supra, 513 F.3d at p. 1037.) The court distilled the following rule from Supreme Court precedent: "Where, as here, Congress has explicitly granted a power to a national bank without any indication that Congress intended for that power to be subject to local restriction, Congress is presumed to have intended to *660 preempt state laws such as [California Civil Code] § 1748.9." (Ibid.) Given the stated legal rule and the circumstances of the case, the Rose court held it was required by Supreme Court precedent to conclude section 1748.9 was preempted. (Rose, at p. 1038.) Rose relied on three Supreme Court cases in support of its conclusion: Watters, supra, 550 U.S. at page 18; Barnett Bank of Marion Cty., N.A. v. Nelson (1996) 517 U.S. 25, 33-35 [134 L.Ed.2d 237, 116 S.Ct. 1103] (Barnett); and Franklin Nat. Bank v. New York (1954) 347 U.S. 373, 378 [98 L.Ed. 767, 74 S.Ct. 550] (Franklin). (Rose, at pp. 1037-1038.)
The Rose district court began with a similar analysis. (Rose v. Chase Manhattan Bank USA, supra, 396 F.Supp.2d at pp. 1119-1120.) In addition, the district court proceeded to analyze 12 Code of Federal Regulations part 7.4008(d) (2010). (Rose v. Chase Manhattan Bank USA, supra, at pp. 1121-1122.) The district court found part 7.4008(d) to be compatible and consistent with prior Supreme Court decisions. (Rose v. Chase Manhattan Bank USA, supra, at p. 1121.) The district court further found part 7.4008(d) to be "a valid exercise of the Comptroller's power to preempt inconsistent state law" (Rose v. Chase Manhattan Bank USA, supra, at pp. 1121-1122) under the notice and comment rulemaking procedures prescribed by title 12 of the United States Code section 43. This regulation preempts section 1748.9 because it deems inapplicable to national banks state laws that "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers" (12 C.F.R. § 7.4008(d)(1) (2010)) and it authorizes a "national bank [to] make non-real estate loans without regard to state law limitations concerning: [¶] . . . [¶] [d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in . . . credit-related documents" (12 C.F.R. § 7.4008(d)(2)(viii) (2010); see Rose v. Chase Manhattan Bank USA, supra, at pp. 1121-1122).
We must affirm the judgment if we agree either that the result in Rose, supra, 513 F.3d at page 1037, follows from Supreme Court precedent, or that 12 Code of Federal Regulations part 7.4008(d) (2010) is a validly enacted regulation that preempts by its own force section 1748.9.

No Preemption by the NBA
As noted above, the NBA (in particular, 12 U.S.C. § 24 (par. Seventh)) provides little guidance on the question of whether state laws requiring disclosures in addition to those required by federal consumer protection law should be preempted when applied to national banks. Unlike the Ninth *661 Circuit Court of Appeals, we do not think United States Supreme Court authorities provide an easy answer either.[4]
In Franklin, New York passed a law prohibiting all entities other than state-chartered savings banks or savings and loan associations from making "`use of the word "saving" or "savings" or their equivalent in its banking or financial business, or us[ing] any advertisement containing the word "saving" or "savings," or their equivalent . . . .'" (Franklin, supra, 347 U.S. at p. 374, fn. 1.) Federal law authorized national banks to receive "`savings deposits.'" (Id. at p. 375.) The appellant violated the state law by using "the word `saving' and `savings' in advertising, in signs displayed in the bank, on its deposit and withdrawal slips, and in its annual reports." (Id. at p. 376.) The Supreme Court found a "clear conflict" between New York's law and federal law. (Id. at p. 378.) The Supreme Court held national banks must be permitted to accept savings deposits; further, national banks may not be restricted from describing or advertising its services as savings accounts because this is necessary to compete in the business of accepting deposits in the banking industry. (Ibid.)
In Barnett, the Supreme Court was presented with the question of "whether a federal statute that permits national banks to sell insurance in small towns pre-empts a state statute that forbids them to do so." (Barnett, supra, 517 U.S. at p. 27.) The Florida statute at issue stated, "in essence, that banks cannot sell insurance in Floridaexcept that an unaffiliated small town bank . . . may sell insurance in a small town." (Id. at p. 29.) The court first observed there was no irreconcilable conflict between the two statutes: national banks could comply with both federal law and state law by not acting as an insurance agent in Florida. (Id. at pp. 31-32.) But the Court concluded the federal grant of authority"national banks `may . . . act as the agent' for insurance sales [(12 U.S.C. § 92)]"was designed to grant "a broad, not a limited, permission." (Id. at p. 32.) The court next summarized relevant law: "[N]ormally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the power to regulate national banks, where (unlike *662 here) doing so does not prevent or significantly interfere with the national bank's exercise of its powers." (Id. at p. 33.) The court held the Florida statute was preempted. (Id. at pp. 37, 43.)
In Watters, the Supreme Court was faced with the question of whether national banks' "operating subsidiaries" (which are state-chartered entities) are properly regulated by state regulators via licensing schemes, reporting requirements, and visitorial powers (the last being the regulatory power to conduct audits and surveillance of the regulated entity). (Watters, supra, 550 U.S. at p. 7.) The court reiterated: "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." (Id. at p. 12.) The Supreme Court concluded that, because national banks were authorized by statute and regulation to do business through non-bank-operating subsidiaries and because federal law vested visitorial powers over national banks solely to the OCC, national banks' operating subsidiaries are subject solely to the visitorial oversight of the OCC and not state regulators. (Id. at pp. 20-21; see 12 U.S.C. § 484(a) ["No national bank shall be subject to any visitorial powers except as authorized by Federal law . . ."].) The Supreme Court's interpretation comported with 12 Code of Federal Regulations part 7.4006 (2010), which provides that state laws applied to operating subsidiaries "`to the same extent that those laws apply to the parent national bank'" (Watters, at p. 20), but the court explicitly declined to clarify whether the OCC's regulation was owed any deference. (Id. at p. 21.)[5]
(6) In sum, according to pertinent Supreme Court conflict preemption precedents, the NBA precludes states from forbidding, or impairing significantly, the exercise of a power explicitly granted to national banks by the NBA.
(7) On its face, section 1748.9 does not forbid the exercise of a banking power authorized by the NBA. Section 1748.9 does not bar national banks from loaning money on personal security through convenience checks. Instead, section 1748.9 is a generally applicable disclosure law applying to any "credit card issuer that extends credit to a cardholder through the use of a preprinted check . . . ." (§ 1748.9, subd. (a).) Rather than forbidding the loaning of money via convenience checks, section 1748.9, subdivision (a), *663 merely requires "clear and conspicuous" disclosures of three items of information and requires those disclosures to be attached to the convenience checks.
But the question remains whether section 1748.9 significantly impairs the exercise of the power to lend money on personal security. The court's grant of judgment on the pleadings precludes an examination of the factual question of how national banks are actually burdened by section 1748.9. Clearly, section 1748.9 facially imposes some burden (whether significant or not) on national banks. And regardless of the particular burden imposed by section 1748.9, MBNA and other national banks would prefer to avoid navigating particular regulatory regimes in each of the 50 states. Does section 1748.9 (or any similar state disclosure law) amount to a significant impairment of MBNA's power to loan money on personal security as a matter of law?
An affirmative answer to this question would have the benefit of establishing clarity in the law. National banks could safely ignore section 1748.9 and other state disclosure laws without considering whether a particular statute will be preempted based on a trial court's factual findings. (See Rose, supra, 513 F.3d at p. 1037 ["Where, as here, Congress has explicitly granted a power to a national bank without any indication that Congress intended for that power to be subject to local restriction, Congress is presumed to have intended to preempt state laws such as [California Civil Code] § 1748.9."].)
But our role, of course, is not to divine the best policy. We are tasked with deciding whether the NBA (which is itself silent on the question of disclosure obligations) preempts section 1748.9, not whether Congress should have preempted all state consumer disclosure laws when it enacted TILA or the NBA. And, according to the United States Supreme Court, the preemption test is not whether the law causes "any" impairment of the exercise of banking powers; the test is whether such impairment is "significant."
One federal district court case explored the preemption question with regard to the extensive disclosure requirements mandated by Civil Code section 1748.13. (American Bankers Assn. v. Lockyer (E.D.Cal. 2002) 239 F.Supp.2d 1000 (American Bankers).) A variety of federally regulated financial institutions (including but not limited to national banks chartered under the NBA) challenged the validity of Civil Code section 1748.13 on the grounds that it was preempted by various federal banking laws. (American Bankers, at pp. 1001-1002, 1006.) The banks introduced evidence showing estimated costs of compliance with the statute. (Id. at p. 1005.) The court ultimately granted summary judgment and a permanent injunction to the banks, prohibiting California from enforcing the statute against all federally chartered credit card issuers. (Id. at p. 1022.)
*664 (8) The American Bankers court first explained that TILA's "savings clause" (15 U.S.C. § 1610(a)(1)) is expressly limited to TILA and does not purport to preclude other federal law from preempting state regulation of disclosures. (American Bankers, supra, 239 F.Supp.2d at p. 1009.)
As to the NBA, the court, reviewing the evidence and deferring to an OCC amicus curiae brief and opinion letter, concluded Civil Code section 1748.13 imposed substantial monetary and nonmonetary burdens on national banks. (American Bankers, supra, 239 F.Supp.2d at pp. 1016-1018.) The court further indicated its agreement with OCC's position (in 2002) that certain "de minimus" disclosure requirements might not be preempted by federal law. (Id. at p. 1019, italics omitted.) The court opined that one portion of the statute fell within the de minimis exception as its effects were salutary and its burdens were minimal. (Id. at pp. 1019-1020; see Civ. Code, § 1748.13, subd. (a)(1) ["A credit card issuer shall, with each billing statement provided to a cardholder in this state, provide the following on the front of the first page of the billing statement in type no smaller than that required for any other required disclosure, but in no case in less than 8-point capitalized type: [¶] (1) A written statement in the following form: `Minimum Payment Warning: Making only the minimum payment will increase the interest you pay and the time it takes to repay your balance.'"].) But the court ultimately concluded that Civil Code section 1748.13, subdivision (a)(1), could not be severed from the remainder of the statute in order to be enforced only against some federally chartered institutions (the national banks). (American Bankers, at pp. 1020-1021.)
American Bankers is a mixed bag for the parties in this case. On the one hand, the ultimate result was the preemption of Civil Code section 1748.13, a California statute that regulates disclosures provided by credit card issuers. On the other hand, the statute at issue in American Bankers is lengthy and detailed, and the court reached its decision only after considering actual evidence of the burdens placed on banking institutions. Under American Bankers, some disclosure laws are simply not significant enough to be preempted.
Moreover, our California Supreme Court endorsed leaving some NBA preemption decisions open to factual proof in a different context 25 years ago: "Although conceivably information not contained in the pleadings might lead to a different conclusion, such information is not before us in reviewing a judgment upon demurrer. We cannot presume, without evidence, that prohibiting a national bank from setting unreasonable prices or enforcing an unconscionable contract will render that bank less efficient, less competitive or less able to fulfill its function in a national banking system." (Perdue v. Crocker National Bank (1985) 38 Cal.3d 913, 943-944 [216 Cal.Rptr. 345, 702 P.2d 503] (Perdue) [discussed below in detail].)
*665 (9) We conclude that when a state disclosure requirement does not, on its face, forbid or significantly impair national banks from exercising a power granted to it by Congress under the NBA, national banks claiming preemption must make a factual showing that the disclosure requirement significantly impairs the exercise of the relevant power or powers. Section 1748.9 does not, on its face, significantly impair federally authorized powers under the NBA. It consists of a brief disclosure requirement that applies only to convenience checks. Of course, given the procedural posture of this case, MBNA has not yet had an opportunity to submit evidence establishing a significant impairment. We need not elucidate a precise "yardstick for measuring when a state law `significantly interferes with . . .'. . . the exercise of national banks' powers." (American Bankers, supra, 239 F.Supp.2d at p. 1017 [noting the absence of such a yardstick, commenting that the "threshold of preemption is in some cases remarkably low," but also indicating "other burdens are insufficient to warrant preemption"].)

No Preemption by 12 Code of Federal Regulations Part 7.4008
(10) "`"`Federal regulations may preempt state law just as fully as federal statutes.'"'" (Miller, supra, 170 Cal.App.4th at p. 984.) A regulation issued by OCC, 12 Code of Federal Regulations part 7.4008(d) (2010), purports to preempt the application of certain state laws to national banks. In addition to the district court in Rose, several other courts have applied 12 Code of Federal Regulations part 7.4008 (2010) to invalidate state laws as applied to national banks. (See Miller, supra, 170 Cal.App.4th at pp. 985-988 [without examining validity of OCC regulations, holding Civ. Code, §§ 9, 11 to be preempted by 12 C.F.R. § 7.4008(d)(2)(iv) (2010)]; Augustine v. FIA Card Services, N.A. (E.D.Cal. 2007) 485 F.Supp.2d 1172, 1175-1176 [claims under California unfair competition law against credit card issuer for retroactively increasing interest rates preempted by 12 C.F.R. § 7.4008(d)(2)(iv) (2010)].)
It is clear that 12 Code of Federal Regulations part 7.4008(d) (2010), if valid, expressly preempts section 1748.9. This regulation deems inapplicable to national banks state laws that "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers" (12 C.F.R. § 7.4008(d)(1) (2010)) and it authorizes a "national bank [to] make non-real estate loans without regard to state law limitations concerning: [¶] . . . [¶] [d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in . . . credit-related documents" (12 C.F.R. § 7.4008(d)(2)(viii) (2010)). In light of this clear, specific language, it would be disingenuous to claim that section 1748.9 falls within one of the general categories identified in 12 Code of Federal Regulations part 7.4008(e)(8) (2010), in which state law is not *666 preempted (e.g., state law pertaining to contracts, torts, or "[a]ny other law the effect of which the OCC determines to be incidental to the non-real estate lending operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section").
Parks claims 12 Code of Federal Regulations part 7.4008 (2010) is invalid insofar as it purports to preempt section 1748.9. The thrust of Parks's argument is that OCC lacked authority to essentially announce that the NBA preempted the field of disclosure law (or, more broadly, consumer protection law) with regard to national banks. As discussed above, the NBA itself has traditionally been interpreted as preempting state consumer protection legislation that conflicted with the NBA's terms by foreclosing banking activities authorized by the NBA or by imposing unreasonable burdens on national banks in their exercise of powers authorized by the NBA.
Nothing suggests OCC failed to follow the proper procedures in enacting its rule, i.e., notice and comment rulemaking procedures prescribed by title 12 of the United States Code section 43. (See Rose v. Chase Manhattan Bank USA, supra, 396 F.Supp.2d at pp. 1121-1122.) This statute contemplates that OCC will issue "opinion letter[s]" and "interpretive rule[s]" on the question of whether "[f]ederal law preempts the application to a national bank of . . . State law regarding . . . consumer protection [and] fair lending . . . ." (12 U.S.C. § 43(a).) Thus, OCC had authority to issue regulations interpreting the preemptive effect of the NBA and other federal law on state law with regard to national banks. And it is not disputed by Parks that OCC complied with the procedures required by title 12 of the United States Code section 43. The question before us is whether the OCC's regulationa blanket ban on all state disclosure requirements applying to national banksis substantively valid.
The United States Supreme Court recently concluded OCC went too far in issuing a different regulation pertaining to preemption. (See Cuomo v. Clearing House Assn., L. L. C. (2009) 557 U.S. ___ [174 L.Ed.2d 464, 129 S.Ct. 2710] (Cuomo).) The pertinent regulation defines visitorial powers to include "[e]nforcing compliance with any applicable federal or state laws concerning [activities authorized or permitted pursuant to federal banking law]." (12 C.F.R. § 7.4000(a)(2)(iv) (2010); see Cuomo, at p. ___ [129 S.Ct. at p. 2715].) As explained in Watters, supra, 550 U.S. 1, only OCC may exercise visitorial powers over national banks and their operating subsidiaries. (Cuomo, at p. ___ [129 S.Ct. at p. 2717].) Thus, 12 Code of Federal Regulations part 7.4000(a)(2)(iv) (2010) "prohibits the States from `prosecuting enforcement actions' except in `limited circumstances authorized by federal law.'" (Cuomo, at p. ___ [129 S.Ct. at p. 2715].) New York's Attorney General (first Eliot Spitzer, and then Andrew M. Cuomo) appealed *667 the lower courts' determination that they were precluded by federal law from investigating national banks and bringing enforcement actions against national banks for alleged violations of state fair lending laws. (Id. at p. ___ [129 S.Ct. at p. 2714].)
"Under the familiar Chevron[6] framework, [courts] defer to an agency's reasonable interpretation of a statute it is charged with administering." (Cuomo, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2715].) OCC "can give authoritative meaning to the [NBA] within the bounds of . . . uncertainty [inherent in the law]." (Ibid.) "But the presence of some uncertainty does not expand Chevron deference to cover virtually any interpretation of the National Bank Act." (Ibid.) The Supreme Court found the OCC rule would produce absurd results, in that some state regulation is not preempted by the NBA but state regulators would be precluded from enforcing such regulations. (Id. at p. ___ [129 S.Ct. at p. 2718].) Further, the court observed the OCC rule "attempts to do what Congress declined to do: exempt national banks from all state banking laws, or at least state enforcement of those laws." (Id. at p. ___ [129 S.Ct. at p. 2720].) The court vacated the portion of a lower court injunction against the New York Attorney General that precluded him from bringing judicial enforcement actions against national banks. (Id. at p. ___ [129 S.Ct. at p. 2722].)
In Perdue, supra, 38 Cal.3d at pages 937-939, our Supreme Court held an OCC regulation purporting to preempt all state laws limiting bank service charges to be invalid. The regulation provided "that state laws limiting bank service charges `are preempted by the comprehensive federal statutory scheme governing the deposit-taking function of national banks' . . . ." (Id. at p. 938.) The Perdue court found "no comprehensive federal statutory scheme governing the taking of deposits. There is one relevant statute, section 24 of the National Bank Act, and that merely authorizes banks to accept deposits. Section 24 may by implication also authorize banks to charge for deposit-related services as an incidental power necessary to carry on the business of receiving deposits, but such implied authority does not constitute a regulatory scheme so comprehensive as to displace state law." (Ibid.)
After construing relevant Supreme Court authority, the Perdue court concluded that OCC's rule was "not a reasonable interpretation of the controlling statutes. [Citation.] It is not an attempt to interpret the language of the statute, fill in the gaps in the statutory coverage, or to explain how the Comptroller will exercise his discretion. Instead, the regulation, insofar as it claims federal preemption, represents legislation of far-reaching character and effect, of a type never considered by Congress, which would radically alter the respective *668 roles of the states and the Comptroller in the regulation of bank-depositor contracts. Such legislation cannot be enacted in the guise of statutory interpretation." (Perdue, supra, 38 Cal.3d at p. 941, fns. omitted.) The Perdue court reversed the judgment granted to the defendants following a successful demurrer to contract and unfair competition claims made by the plaintiffs, holding: "We cannot presume, without evidence, that prohibiting a national bank from setting unreasonable prices or enforcing an unconscionable contract will render that bank less efficient, less competitive or less able to fulfill its function in a national banking system." (Id. at pp. 943-944.)
(11) The skepticism previously expressed by both the California Supreme Court and United States Supreme Court regarding some of OCC's preemption regulations is readily applied to the circumstance before us. (See also Hood v. Santa Barbara Bank & Trust (2006) 143 Cal.App.4th 526, 547-548 [49 Cal.Rptr.3d 369] [declining to defer to OCC's preemption regulations].) The language of 12 Code of Federal Regulations part 7.4008(d) (2010) does not suggest a reasonable attempt to describe and interpret the reach of NBA preemption. (12 U.S.C. § 43 [authorizing OCC to issue opinion letters or interpretative rules on the scope of federal preemption].) Rather, the regulation exempts national banks from all state disclosure requirements, even though neither the NBA nor TILA expressed an intention to create this bright-line exemption.
(12) MBNA claims that greater deference should be shown to OCC because 12 Code of Federal Regulations part 7.4008(d) (2010) is allegedly not an "interpretive rule" authorized by section 43 of title 12 of the United States Code. Instead, according to MBNA, part 7.4008(d) represents "plenary" legislative rulemaking authorized by title 12 of the United States Code section 93a (the OCC "is authorized to prescribe rules and regulations to carry out the responsibilities of the office"). The premise behind this argument is that OCC, like any duly authorized federal agency, can issue substantive regulations through notice-and-comment rulemaking that, of their own force, preempt state law. We agree with MBNA that legislative rules issued by federal agencies can preempt state law, if such rules are within the power delegated to the agency by Congress. (See, e.g., Fidelity Federal Sav. & Loan Assn. v. De La Cuesta (1982) 458 U.S. 141, 153-170 [73 L.Ed.2d 664, 102 S.Ct. 3014] [agency's regulation authorizing use of "due-on-sale" clause preempts state law limiting use of such provisions].) No authority, however, is provided by MBNA for the proposition that Congress has delegated the power to OCC to take "administrative action whose sole purpose [is] to preempt state law rather than to implement a statutory command." (Watters, supra, 550 U.S. at p. 44 (dis. opn. of Stevens, J.).)
(13) Although we are reluctant to create a split of authority with the Ninth Circuit Court of Appeals on a point of federal law, our understanding *669 of the authorities discussed above requires us to do so. It is still possible MBNA may demonstrate that section 1748.9 imposes burdens on national banks that significantly impair the authority granted to it by the NBA. But there is no basis for preempting section 1748.9 without a factual record.[7]

DISPOSITION
The judgment is reversed. Parks shall recover his costs on appeal.
Moore, Acting P. J., and Aronson, J., concurred.
NOTES
[1] MBNA renamed itself as FIA Card Services, N.A. Nevertheless, for the sake of simplicity, we shall follow the parties in continuing to refer to defendant as MBNA.
[2] We grant Parks's motion requesting that we take judicial notice of a conference report of the United States Congress and certain materials in the Federal Register.
[3] Paragraph (a) of 12 Code of Federal Regulations part 7.4008 (2010) provides: "A national bank may make, sell, purchase, participate in, or otherwise deal in loans and interests in loans that are not secured by liens on, or interests in, real estate, subject to such terms, conditions, and limitations prescribed by the [OCC] and any other applicable Federal law."
[4] In contrast, the extent of preemption is much clearer with regard to state regulation of allowable interest rates or late fees through usury laws. (See, e.g., 12 U.S.C. § 85 [authorizing national banks to charge "interest at the rate allowed by the laws of the State . . . where the bank is located"]; Marquette Nat. Bank v. First of Omaha Corp. (1978) 439 U.S. 299, 313, 318 [58 L.Ed.2d 534, 99 S.Ct. 540] [holding the NBA permits national banks to charge interest on any loan up to the maximum rate allowed by the single state where the bank is "located," regardless of usury laws in the state where the consumer loan is provided (the "exportation" doctrine)]; Smiley v. Citibank (South Dakota), N.A. (1996) 517 U.S. 735, 745-747 [135 L.Ed.2d 25, 116 S.Ct. 1730] [deferring to reasonable OCC interpretation in concluding late fees are included in NBA's definition of "interest" and these fees are therefore exclusively regulated by the national bank's home state].)
[5] Three members of the Watters court dissented; one point of contention was the OCC's aggressive efforts to preempt state law. (Watters, supra, 550 U.S. at p. 44 (dis. opn. of Stevens, J.) ["Never before have we endorsed administrative action whose sole purpose was to preempt state law rather than to implement a statutory command."].)
[6] Chevron U.S.A. v. Natural Res. Def. Council (1984) 467 U.S. 837 [81 L.Ed.2d 694, 104 S.Ct. 2778].
[7] Interestingly, in its two-page amicus curiae brief filed at the invitation of this court, OCC did not assert that 12 Code of Federal Regulations part 7.4008(d) (2010) requires this court to find section 1748.9 is preempted. The OCC did not mention its regulations in its brief. Instead, the OCC "fully concurs in the Ninth Circuit's analysis in its opinion" in Rose, supra, 513 F.3d 1032, which did not rely on 12 Code of Federal Regulations part 7.4008(d) (2010).