# United States Court of Appeals
## For the First Circuit

No. 16-2171

CSX TRANSPORTATION, INC.; CSX INTERMODAL TERMINALS, INC.;
NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a Amtrak;
SPRINGFIELD TERMINAL RAILWAY COMPANY,

Plaintiffs, Appellees,

v.

MAURA HEALEY, in her official capacity as Attorney General of
the Commonwealth of Massachusetts,

Defendant, Appellant,

TRANSPORTATION DIVISION OF THE INTERNATIONAL ASSOCIATION OF
SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS; MECHANICAL
DIVISION OF THE INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR,
RAIL AND TRANSPORTATION WORKERS; BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN; BROTHERHOOD OF MAINTENANCE OF WAY
EMPLOYES DIVISION/IBT; BROTHERHOOD OF RAILROAD SIGNALMEN;
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS; NATIONAL
CONFERENCE OF FIREMEN & OILERS DISTRICT OF LOCAL 32BJ, SEIU,

Defendants.

---

No. 16-2172

CSX TRANSPORTATION, INC.; CSX INTERMODAL TERMINALS, INC.;
NATIONAL RAILROAD PASSENGER CORPORATION, d/b/a Amtrak;
SPRINGFIELD TERMINAL RAILWAY COMPANY,

Plaintiffs, Appellees,

v.

TRANSPORTATION DIVISION OF THE INTERNATIONAL ASSOCIATION OF
SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS; MECHANICAL
DIVISION OF THE INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR,
RAIL AND TRANSPORTATION WORKERS; BROTHERHOOD OF LOCOMOTIVE

ENGINEERS AND TRAINMEN; BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT; BROTHERHOOD OF RAILROAD SIGNALMEN; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS; NATIONAL CONFERENCE OF FIREMEN & OILERS DISTRICT OF LOCAL 32BJ, SEIU,

Defendants, Appellants,

MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts,

Defendant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Lynch, Lipez, and Kayatta,
Circuit Judges.

---

Douglas S. Martland, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, and Pierce O. Cray, Assistant Attorney General, were on brief, for the Commonwealth appellant.

Michael S. Wolly, with whom Zwerdling, Paul, Kahn & Wolly, P.C., Richard S. Edelman, Mooney, Green, Saindon, Murphy and Welch PC, Erika A. Diehl-Gibbons, Kevin C. Brodar, and SMART-TD were on brief, for the union appellants.

Donald J. Munro, with whom Anthony J. Dick and Jones Day were on brief, for the appellees.

M. Patricia Smith, Solicitor of Labor, United States Department of Labor, G. William Scott, Associate Solicitor, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, Melissa Moore, Attorney, Plan Benefits Security Division, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, United States Department of Justice, Civil Division, Alisa B. Klein, Attorney, Appellate Staff, Civil Division, Lindsey Powell, Attorney, Appellate Staff, Civil Division, and Carmen M. Ortiz, United States Attorney, on brief for the United States as amicus curiae in support of the appellants.

June 23, 2017

KAYATTA, Circuit Judge. In 2014, Massachusetts voters enacted by plebiscite the Massachusetts Earned Sick Time Law ("MESTL"). 2014 Mass. Legis. Serv. ch. 505 (West). The law requires most employers with eleven or more employees to provide "[e]arned paid sick time" for a variety of reasons, including absence from work due to illness. Mass. Gen. Laws ch. 149, § 148C(a)-(c). The question posed by these appeals is whether application of the MESTL to interstate rail carriers that employ workers in Massachusetts is preempted by the Railroad Unemployment Insurance Act ("RUIA"), 45 U.S.C. §§ 351-369. That federal law requires interstate rail carriers to bear the cost of an insurance program for employees who miss work on account of sickness and are not otherwise compensated during their absence. See id. § 352(a)(1)(B). The RUIA states that its provision for the payment of sickness benefits is "exclusive," and that no person employed by an interstate rail carrier "shall have or assert any right . . . to sickness benefits under a sickness law of any State." Id. § 363(b).

For the following reasons, we agree with the district court that the RUIA certainly preempts some parts of the MESTL as applied to employees of interstate rail carriers. We nevertheless remand for further consideration of whether other parts of the Massachusetts law that are not within the preemptive reach of the

- 4 -

RUIA, and are not otherwise preempted by another federal law, might still be applied to interstate rail carriers.

## I.

## A.

As originally enacted in 1938, the RUIA mandated that interstate rail carriers fund an insurance system that provides partial wage replacement, known as "unemployment benefits," to covered employees who are not working but who are able and available to work. See Act of June 25, 1938, ch. 680, §§ 1(k), 2(a), 52 Stat. 1094, 1096 (codified as amended at 45 U.S.C. §§ 351(k)(1), 352(a)(1)(A)). In 1946, Congress added to the RUIA a mandate that interstate rail carriers also fund "sickness benefits" to provide a minimum level of wage replacement for employees unable to work due to sickness. See Act of July 31, 1946, ch. 709, §§ 301–07, 60 Stat. 722, 735-37 (codified at 45 U.S.C. §§ 351(h)–(i), (k)(2), (l), 352(a), (c), (f)).

Adding sickness benefits to the statute required Congress to address a series of questions. Who was covered? Which conditions qualified as a sickness? When did the employee become eligible for sickness benefits? What was the amount and duration of the benefits? How and to what extent must the employer fund the benefits? The text of the RUIA answers each of these questions. As generally applicable to most employees, it requires the payment of "sickness benefits" for "each day of sickness after

- 5 -

the 4th consecutive day of sickness in a period of continuing sickness."[1] 45 U.S.C. § 352(a)(1)(B)(i). A "day of sickness" means "a calendar day on which because of any physical, mental, psychological, or nervous injury, illness, sickness, or disease [the employee] is not able to work." Id. § 351(k)(2). It also encompasses, "with respect to a female employee, a calendar day on which, because of pregnancy, miscarriage, or the birth of a child, (i) she is unable to work or (ii) working would be injurious to her health." Id. The only added criteria defining "day of sickness" are that a "day of sickness" does not include: (1) a day on which "remuneration is payable or accrues to [the employee]," or (2) a day of unpaid absence not documented in accordance "with such regulations as the [Railroad Retirement] Board may prescribe." Id. In other words, the employee gets no wage replacement if the employee is collecting payment for services anyhow, or if the employee does not document the claim for sickness benefits in accordance with regulations established by the Board that administers these benefits.

These decisions by Congress established only the minimum level of benefits that must be paid. Employers remained free to provide benefits to sick workers sooner, to continue benefits

---

[1] In certain circumstances, the statute imposes a one-week waiting period such that no benefits are payable for the employee's first seven days of sickness. 45 U.S.C. § 352(a)(1)(B)(ii).

- 6 -

longer, or to pay benefits at higher rates.  The employees, in turn, remained free to bargain for better benefits.

**B.**

Having mandated a nationwide, minimum level of sickness benefits for this quintessentially interstate business, Congress also exercised its power under the Supremacy Clause to preempt certain state laws.  The text of the preemption provision states as follows:

> By enactment of this chapter the Congress makes exclusive provision for the payment of unemployment benefits for unemployment occurring after June 30, 1939 and for the payment of sickness benefits for sickness periods after June 30, 1947, based upon employment (as defined in this chapter). No employee shall have or assert any right to unemployment benefits under an unemployment compensation law of any State with respect to unemployment occurring after June 30, 1939, or to sickness benefits under a sickness law of any State with respect to sickness periods occurring after June 30, 1947, based upon employment (as defined in this chapter). The Congress finds and declares that by virtue of the enactment of this chapter, the application of State unemployment compensation laws after June 30, 1939, or of State sickness laws after June 30, 1947, to such employment, except pursuant to section 362(g) of this title, would constitute an undue burden upon, and an undue interference with the effective regulation of, interstate commerce.

Id. § 363(b).

The parties agree that the foregoing language, as applied today to interstate rail carriers, plainly preempts any

mandate to provide "sickness benefits under a sickness law of any State . . . based upon employment." Id. Their disagreement centers on whether the employee benefits mandated by the MESTL qualify as such. Before the MESTL took effect, several interstate rail carriers sought assurance from the Massachusetts Attorney General that the law would not apply to their railroad employees working in Massachusetts. The Attorney General "declined to offer any assurances" about the relationship between the state and federal laws.

Facing "a substantial threat of imminent prosecution," the carriers filed the present action against the Attorney General seeking a declaratory judgment that the MESTL is preempted by the RUIA as well as by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-165, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. The district court permitted several unions representing Massachusetts railroad workers to intervene as defendants. It also accepted a "statement of interest" filed by the United States in support of the defendants. In due course, the district court granted summary judgment in favor of the plaintiff carriers, holding that the RUIA preempted the MESTL in its entirety as applied to the plaintiff carriers. In so disposing of the action, the district court did not reach the plaintiffs' alternative claims that either the RLA or ERISA preempted the MESTL, which the parties had agreed to litigate, if necessary, in

- 8 -

a second phase of the action.  Nor did it expressly consider whether any portions of the MESTL might be saved by severance.  Following entry of final judgment in favor of the plaintiff carriers, the Attorney General and the union intervenors (collectively, "appellants") timely appealed.

**II.**

We start with the text of the MESTL and ask whether it provides "sickness benefits under a sickness law of any State" as that phrase is used in 45 U.S.C. § 363(b).  In its most relevant part, the MESTL states:

> (c) Earned sick time shall be provided by an employer for an employee to:
>
>> (1) care for the employee's child, spouse, parent, or parent of a spouse, who is suffering from a physical or mental illness, injury, or medical condition that requires home care, professional medical diagnosis or care, or preventative medical care; or
>>
>> (2) care for the employee's own physical or mental illness, injury, or medical condition that requires home care, professional medical diagnosis or care, or preventative medical care; or
>>
>> (3) attend the employee's routine medical appointment or a routine medical appointment for the employee's child, spouse, parent, or parent of spouse; or
>>
>> (4) address the psychological, physical or legal effects of domestic violence . . . .

Mass. Gen. Laws ch. 149, § 148C(c)(1)-(4).  Qualified employees may earn and use up to forty hours of sick time per year, id.

- 9 -

§ 148C(d)(4), (6), and those at firms of eleven or more employees are entitled to payment for the sick time they use at their normal hourly rate through their usual payroll system, id. § 148C(a),(d)(4),(d)(7).

We observe at the outset that the four quoted subsections of § 148C(c) of the MESTL recognize several different reasons for which paid sick time must be provided. One of those reasons, as specified in subsection (c)(2), is the need to "be absent from work . . . to . . . care for the employee's own physical or mental illness, injury, or medical condition." Id. § 148C(b)-(c)(2). Plainly a benefit paid for such a reason is a benefit that helps protect an employee from economic loss resulting from a sickness. Other uses (such as, for example, addressing the legal effects of domestic violence) seemingly have nothing to do with employee sickness. We will therefore begin our analysis by focusing on MESTL subsection (c)(2).

**A.**

Crafting subsection (c)(2) of the MESTL required answering the questions addressed by Congress in creating the RUIA's sickness benefits. Who was covered? Which conditions qualified as a sickness? When did the employee become eligible for sickness benefits? What was the amount and duration of the benefits? And so on. On many such questions, the MESTL reflects different answers than does the RUIA. Rather than requiring

- 10 -

employers to fund an insurance program that in turn pays workers, the MESTL requires the employer to pay the worker directly. The MESTL also mandates payment starting on the very first hour of absence due to sickness at one hundred percent of regular pay. See id. § 148C(a),(d)(1). But earned paid sick time under the MESTL is limited to forty hours per calendar year. Id. § 148C(d)(4),(7). The upshot: as compared to the RUIA sickness benefits, the MESTL sick time is a larger benefit in the short run but does not cover the longer run.

At first blush, and even more so after a careful read, it seems quite plain that subsection (c)(2) of the MESTL provides "sickness benefits under a sickness law of [a] State," and is therefore expressly preempted. Certainly a "physical or mental illness, injury, or medical condition" is a sickness, and certainly "paid sick time" is a benefit. Nevertheless, the appellants and the United States as amicus curiae advance several arguments in support of their reading of the preemption clause as a narrow provision with a meaning that does not encompass the type of benefits mandated by subsection (c)(2). We consider those arguments, moving from simple to complex.

**B.**

**1.**

The appellants first try an ordinary meaning argument. See In re Hill, 562 F.3d 29, 32 (1st Cir. 2009) ("We assume that

- 11 -

the words Congress chose, if not specially defined, carry their plain and ordinary meaning."). Citing to Roberts' Dictionary of Industrial Relations, they contend that the term "sick benefit" is customarily understood to mean only "short-term disability insurance," and not "sick pay" or "sick leave." Harold S. Roberts, Roberts' Dictionary of Industrial Relations (4th ed. 1994). But the pertinent term in the RUIA is "sickness benefits," not "sick benefit." And the pertinent legislation predates the cited dictionary by half a century. The 1998 and 2011 glossaries cited by the union intervenors defining "short-term disability plan" and "sick leave" suffer from the same anachronistic defect. So this argument falls short.

**2.**

The Attorney General next undertakes an elaborate attempt to find in the text of the RUIA a narrow technical reading of "sickness benefits" that excludes the type of benefit that the MESTL mandates in subsection (c)(2). The resulting, principal textual argument has eight steps: The word "benefits" as used in the RUIA is a defined term that "means the money payments payable to an employee as provided in this chapter, with respect to his unemployment or sickness," 45 U.S.C. § 351(*l*)(1) (emphasis supplied); the chapter provides for payments in the form of partial wage replacement when an employee is unable to work, and receiving no earned income, due to sickness, id. § 352(a)(1)(B)(i), (a)(2);

this interpretation of "money payments . . . as provided in this chapter" is confirmed by the definition of "day of sickness," which excludes any day on which the employee receives remuneration from the employer, id. § 351(k)(2); the benefit mandated by the MESTL is not a partial wage replacement for when an employee is unable to work, and receiving no earned income, due to sickness; this interpretation is confirmed by federal law's designation of the MESTL benefit as "remuneration," 20 C.F.R. § 322.2(c); any day the MESTL benefit is paid is thus not a "day of sickness"; that benefit is therefore not a "money payment . . . as provided in th[e] chapter"; and so it is not a "sickness benefit."

We react to this reasoning with considerable skepticism concerning the first step: that "benefits" as used in the preemption clause means only "benefits" as artificially defined in 45 U.S.C. § 351. See Yates v. United States, 135 S. Ct. 1074, 1082 (2015) ("We have several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute."). The definition provision itself warns that the supplied definition of "benefits" does not apply "in phrases clearly designating other payments." 45 U.S.C. § 351(*l*)(1). The preemption clause uses just such a phrase, designating as the target of its preemptive force "sickness benefits under a sickness law of any State." Id. § 363(b) (emphasis supplied). Furthermore,

- 13 -

the preemption clause seems to be express in specifying when it intends a word of common usage to be understood only as defined in the RUIA, four times using the phrase "as defined in this chapter" to modify terms that are given specific meanings in § 351.  Id.

The full text of the preemption clause reinforces our skepticism.  In explaining its exercise of preemptive force, the clause states that "application . . . of State sickness laws . . . to such employment . . . would constitute an undue burden upon, and an undue interference with the effective regulation of, interstate commerce."  Id.  In so stating, Congress found it natural to avoid altogether any use of the word "benefits" upon which the Attorney General's textual argument against preemption depends.  The Attorney General makes no claim that the Massachusetts law is not, in relevant part, "a sickness law of a[] State."  It would therefore be quite remarkable for Congress, having declared that such a law impedes effective regulation of interstate commerce, to have nevertheless excluded it from the scope of preemption by use of the roundabout textual path that the Attorney General has sought to discern.

Tellingly, if the Attorney General were correct that the RUIA preempts only state sickness laws that mandate "benefits" precisely as that term is defined in § 351, then it would follow that no reasonably plausible state law would be preempted.  As summarized above, the defined term "benefits" is limited to money

- 14 -

payments for "days of sickness."  And while the Attorney General is correct that the RUIA's definition of "day of sickness" excludes any day on which remuneration is paid, it also excludes any day for which timely documentation as required by Railroad Retirement Board regulations is not filed.  Id. § 351(k)(2).  So if the Attorney General's textual reading were correct, no state law would be preempted unless, implausibly, it mandated the filing of Railroad Retirement Board documentation.  And the Attorney General ultimately concedes that her interpretation would limit the scope of the preemption clause "to those state laws . . . that create short-term disability insurance programs that would replicate the RUIA's and hence result in duplicate liability for the Railroads."

This interpretation does not comport with the statute's stated purpose of protecting interstate rail regulation from the burdens of state sickness law.  As the United States explains in its brief, the legislative history of § 363(b) and the thrust of the Act's pertinent sections are clear on at least one point:  the RUIA was enacted to ensure "a uniform federal scheme." See H.R. Rep. No. 75-2668 at 1 (1938) ("Congress has long recognized that a number of problems peculiar to the railroad industry necessitate separate treatment of that industry in various aspects, rather than . . . leaving it subject to varied State laws, and to meet that necessity has enacted such legislation as [the RUIA].").  Given that aim, it would have been nonsensical to preempt only

- 15 -

state replicas of the RUIA while allowing dozens of divergent schemes to proliferate. Instead, as is customarily the case, it is the prospect of a clash between differing schemes that most naturally precipitates preemption. See, e.g., Tobin v. Fed. Exp. Corp., 775 F.3d 448, 455 (1st Cir. 2014) (applying preemption clause of Airline Deregulation Act to avoid subjecting national carrier to patchwork of state regulations in contravention of clause's purpose); Danca v. Private Health Care Sys., Inc., 185 F.3d 1, 7 (1st Cir. 1999) (same with respect to ERISA and multi-jurisdiction employer). And even if Congress were concerned only about threats from copycats (such as disparate interpretation, disparate enforcement, or duplicate liability), leaving the door open to almost-but-not-quite copycats invites those same threats.

Nor are we persuaded by the Attorney General's second and related textual argument based on the term "sickness periods." Recall that the RUIA, pursuant to its preemption clause, "makes exclusive provision . . . for the payment of sickness benefits for sickness periods after June 30, 1947." 45 U.S.C. § 363(b). According to the Attorney General, although the term "sickness periods" is not defined in the statute, we should construe it to mean times when the employee both is unable to work due to sickness and is not receiving any remuneration from the employer. Working from that assumption, the Attorney General contends that, "[b]ecause [MESTL] sick pay by definition is pay from the employer,

- 16 -

the necessary 'sickness periods' do not exist, and preemption cannot occur." The United States presses the same argument. In doing so on behalf of the Department of Labor, and not the Railroad Retirement Board, which administers the RUIA, see id. § 362(*l*), the United States makes no claim to any deference due. In any event, this argument fares no better than the "sickness benefits" argument we have already rejected. The appellants offer no sound basis for conflating "sickness periods" with the specifically defined term "period of continuing sickness," see id. § 352(a)(1)(B)(iii), and they fail to refute the natural reading of the phrase "for sickness periods after June 30, 1947" as simply providing an effective date for preemption.

The Attorney General's final stab at using the statutory language to limit the scope of preemption relates to a reimbursement provision in the Act. The provision empowers the Railroad Retirement Board to reimburse a state that provides sickness benefits to workers if the state takes railroad employment into account in determining whether workers are eligible for state sickness benefits or in setting the amount of such benefits. Id. § 362(g). In those circumstances, "the Board is authorized to reimburse such State such portion of such . . . sickness benefits as the Board deems equitable." Id. According to the Attorney General, this situation could never arise unless Congress "anticipate[d] the continued existence of State 'sickness

- 17 -

benefits' and State 'sickness compensation law[s]' as applied to railroads."

This point does not carry the force assigned to it by the Attorney General.  Section 362(g) deals with the "problem of handling those workers who move between the railroad industry and other employment."  Hearings Before a Subcommittee of the Committee on Interstate and Foreign Commerce on H.R. 10127, 75th Cong. 100 (1938) (statement of Horace Bacus); see also H.R. Rep. No. 75-2668, at 11 (1938) (explaining that § 362(g) is a "special provision . . . designed to overcome inequities that may arise in the cases of persons regularly employed in the railroad industry and also elsewhere").  So, for example, a person might work the summer months for a railroad, and then the winter for a local warehouse.  If the worker becomes ill or injured during the winter, the state may count all of his or her days of employment in determining eligibility for state-provided benefits.  There is no suggestion, though, that the state itself may impose on the rail carriers the cost of any benefits paid.  Rather, § 362(g) grants to the Railroad Retirement Board the discretion to reimburse the state in such situations.  The very fact that this discretion and power is granted to the federal board by federal law thus reinforces the fact that the federal law does not allow states of their own accord to impose on interstate rail carriers, even indirectly, the burden of providing state benefits.  In short,

- 18 -

nothing in § 362(g) suggests that there exists any authority outside the "exclusive" reach of federal law for mandating the provision of sickness benefits by interstate rail carriers. And when reimbursements are in fact paid out, they are specifically "included within the meaning of the word 'benefits' as used in [the RUIA]," 45 U.S.C. § 362(g), thereby expanding rather than contracting the scope of "sickness benefits" as the preempted domain.

**3.**

The appellants next claim that various Railroad Retirement Board publications demonstrate that the particular sickness benefits provided under the RUIA do not include employer-provided sick pay or sick leave. For example, the appellants cite a publication noting that "[s]ickness benefits are not payable for any day for which you receive sick pay from your employer." (Quoting U.S. Railroad Retirement Board, <u>Sickness Benefits for Railroad Employees</u>, Form UB-11 4 (2012), https://www.rrb.gov/sites/default/files/2016-10/ub11.pdf.) This sentence must mean, they say, that "sick pay" is not a "sickness benefit" and that railroad workers can receive both. But the quoted language simply describes how the RUIA sickness benefits work; unsurprisingly, employees do not receive the benefits when they are paid for their day off work. There is no reason to think the preemption clause's use of "sickness benefits under a sickness

- 19 -

law of any State" imports this exclusion. See 45 U.S.C. § 363(b). Tellingly, the MESTL benefits likewise need not be paid if the employer is already paying the employee pursuant to, for example, a sick leave plan. See Mass. Gen. Laws ch. 149, § 148(C)(j)-(k). The Board's recognition that a railroad worker might be eligible for both sick pay and RUIA benefits absent some coordination of benefits does not require a reading of the preemption clause that places a state-mandated continuation of wages due to sickness outside the clause's scope. In fact, the union intervenors point to another Board publication that defines "sick pay" as "compensation paid under a plan or agreement," not a state mandate. See U.S. Railroad Retirement Board, Rail Employer Reporting Instructions, Part IV - Particular Types of Compensation Payments, Chapter 3: Sick Pay 1 (2012), https://www.rrb.gov/sites/default/files/2017-06/RERI-Part%20IV_CH%203.pdf.

**4.**

Implicitly acknowledging the problems with their effort to derive a textually restricted definition of "sickness benefits," the appellants and their amicus at times abandon any textual argument in describing what is preempted. They argue, instead, that RUIA preemption applies only to state benefits that are "similar" or "comparable" to, or "of the type provided by[,] the RUIA." Of course, in making this version of their argument,

the appellants and their amicus are adrift:  there is no anchor in the text of the preemption clause for limiting in this manner the type of state-mandated sickness benefits subject to preemption.

They moor, instead, to the context and purpose of the preemption clause.  This is a fair point, at least conceptually.  In construing a statutory provision that expressly preempts state law, we do examine its purpose and context.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996).  Such an examination in this case, though, simply reinforces our conclusion that, even if we limit the preemptive reach of § 363(b) to state sickness benefits that are "similar" or "comparable" to those provided by the RUIA, the paid sick time mandated by subsection (c)(2) of the MESTL would fit comfortably within that limitation.

The MESTL addresses the exact same problem that the RUIA's provision of sickness benefits addresses:  absent legislation or agreement, an employer is not required to bear the cost of providing any form of income to an employee who is not working due to illness.  The MESTL also settles upon a similar type of solution:  make the employer provide a source of income, subject to various conditions and limitations.  In this respect, the appellants and their amicus overlook the fact that the status quo ante, i.e., the state of affairs before enactment of either law at issue, is that whether the employee receives pay during an absence due to sickness hinges on the employment agreement.  If

that agreement requires full pay, neither the RUIA nor the MESTL mandates anything more. Conversely, if no pay is required, then the absence generally counts as a "day of sickness" under the RUIA, and as a day on which the MESTL requires payment of earned paid sick time. So, in this respect, the benefits are much more alike than the appellants claim.

There are, of course, real differences between the respective benefits. As we have explained, the formula used to calculate the onset, duration, and amount of benefits, as well as the manner in which the employer funds the benefits, differ. The Attorney General concedes that such differences do not defeat preemption as long as the state sickness law mandates an "RUIA-like short-term disability insurance" as opposed to some "other form[] of benefits." But it is unclear how, where, or why the Attorney General draws the line between those schemes. The Attorney General seems to argue that the dispositive factor for preemption purposes is the method of payment: indirect employer payments through an insurance fund are preempted, but direct employer payments through a payroll system are not. We are not persuaded that Congress cared only about the mechanism by which burdens were placed on the employer to benefit the employee, and not about the burdens themselves. After all, the statute expressly refers to Congress's concern about the burdens. See 45 U.S.C. § 363(b). Nor are we persuaded that Congress crafted a preemption

- 22 -

clause that a state could readily sidestep merely by burdening the employer more directly. See Daboub v. Gibbons, 42 F.3d 285, 290 (5th Cir. 1995) ("[I]f the language of the act could be so easily circumvented, the preemption provision would be useless, and the policies behind a uniform . . . statute would be silenced.").

For these reasons, among others, we also reject efforts by the United States to use the "historical context in which the amendments were enacted" to limit the scope of the preemption clause. According to the United States, when Congress added sickness benefits to the RUIA in 1946, the only existing state sickness laws required "a similar form of insurance for employees unable to work for an extended period on account of illness or injury." Because no state had passed "an earned-sick-time law" at that time, the United States says, it therefore follows that Congress had in mind only the existing state sickness laws when it amended the preemption clause to bar "any right . . . to sickness benefits under a sickness law of any State." 45 U.S.C. § 363(b). Nothing in the text, however, indicates that Congress meant to preempt all contemporaneous state sickness laws and their ilk, but not any new variations. To the contrary, Congress stated its intent to "make[] exclusive provision . . . for the payment of sickness benefits." Id.

The Attorney General points out that the heading of the RUIA's preemption provision, "Effect on State unemployment

compensation laws," was not amended when the provision itself was amended. As we explained earlier, Congress amended the RUIA in 1946 to add sickness benefits to the unemployment benefits it had mandated in 1938. The Attorney General argues that, because Congress made no revisions to the heading, it meant for the heading to limit the preempted "sickness benefits" to only those sickness benefits mandated by "unemployment compensation laws." But the text of the clause makes plain that Congress knew how to limit preemption to unemployment compensation laws, as it expressly did in the context of the original benefits. See id. ("No employee shall have or assert any right to unemployment benefits under an unemployment compensation law of any State . . . ." (emphasis supplied)). Congress chose different words to describe the preempted domain for sickness benefits. Id. We reject the Attorney General's effort to seek refuge from the force of the statutory text and purpose in the short-hand heading. See Lawson v. FMR LLC, 134 S. Ct. 1158, 1169 (2014) ("[T]he headings here are 'but a short-hand reference to the general subject matter' of the provision, 'not meant to take the place of the detailed provisions of the text.'" (quoting Bhd. of R.R. Trainmen v. Balt. & Ohio R. Co., 331 U.S. 519, 528 (1947))).

We also reject the Attorney General's claim that the MESTL does not tread "within the domain of 'sickness benefits' preempted by [the RUIA]." Application of the MESTL to the

- 24 -

plaintiff interstate rail carriers would directly alter the balance struck by the RUIA in setting a minimum level of costs that must be borne by such carriers to offset partially the hardships to employees caused by an inability to work due to sickness.

**5.**

As evidenced by the foregoing discussion, we find it unnecessary to resolve the parties' debate concerning the nature of any interpretative presumptions that might guide our analysis, in particular the presumption against preemption. See Medtronic, 518 U.S. at 485 ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). Compare Wyeth v. Levine, 555 U.S. 555, 565 n.3 (2009) (rejecting argument that presumption against preemption does not apply in areas of lasting federal regulation), with Brown v. United Airlines, Inc., 720 F.3d 60, 68 (1st Cir. 2013) (rejecting application of presumption against preemption in air-transportation context due to "both longstanding and pervasive" federal regulation in that field). The textual, contextual, and purpose-related cues all point sufficiently strongly in the direction of finding that § 363(b) preempts subsection (c)(2) of the MESTL so as to overcome any presumption that may apply. See Cuomo v. Clearing House Ass'n,

L.L.C., 557 U.S. 519, 534 (2009) (finding presumption against preemption immaterial in light of "plain terms" of federal law).

## C.

Anticipating the possibility that we might agree with the district court that the RUIA preempts subsection (c)(2) of the MESTL as applied to interstate rail carriers, the Attorney General and the union intervenors have asked us in the alternative to determine whether any or all other sections of the MESTL might still be applied to such employers. Resolving this issue of severability raises three potential questions: (1) Are any of the remaining sections of the MESTL themselves preempted by the RUIA? (2) Are any remaining sections that are not so preempted nevertheless preempted by either the RLA or ERISA as alleged in the complaint? (3) Should any sections of the MESTL be preserved by severing the preempted sections as applied to interstate rail carriers?

The district court did not consider these questions, perhaps because the Attorney General did not raise severability in her summary judgment briefing. But the union intervenors raised a severability argument in their memorandum below, and they press severability as an alternative argument on appeal (as does the Attorney General). It is, in short, a contention that was raised below and preserved on appeal, certainly as to the union intervenors. Nor do the plaintiff carriers argue otherwise.

We often hesitate to address in the first instance issues on which we lack the benefit of a district court's consideration. See, e.g., United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 337-38 (1st Cir. 2003) (remanding, after affirming preemption determination, for district court to resolve "three selected issues" where submissions and arguments below adverted to, but did not focus on, such issues). Issues can sharpen--or disappear--when contested and resolved first in the district court. In this case, we lack any answers to the three critical questions. The need to consider each question, in turn, depends in part on the answers to the other questions. For example, were it clear that the MESTL is not severable, then our decision today would dispose of the whole case. Conversely, were it clear that one of the other federal laws preempted all of the MESTL, there would be no need to decide severability. There is some chance, too, that an assessment of all three questions might counsel in favor of certifying the severability question to the Massachusetts Supreme Judicial Court. We therefore decline to reach these questions in the context of the present appeals.

**III.**

We hold that the RUIA preempts subsection (c)(2) of the MESTL as applied to interstate rail carriers that employ workers in Massachusetts. We remand for the district court to determine

whether any or all other sections of the MESTL might be applied to such employers.  Each party shall bear its own costs.

**<u>Affirmed in part, vacated in part, and remanded.</u>**